**Sheila KELLY, Plaintiff,**

v.

**K.D. CONSTRUCTION OF FLORIDA, INC., Defendant.**

**No. 92–6931–CIV.**

United States District Court, S.D. Florida.

Oct. 26, 1994.

Frederick W. Ford, North Palm Beach, FL, Neil I. Lichtblau, West Palm Beach, FL, for plaintiff Sheila Kelly.

Justus W. Reid, Reid, Price & Cameron, P.A., West Palm Beach, FL, Carmen M. Rodriguez, Whitelock, Soloff & Rodriguez, P.A., Fort Lauderdale, FL, for defendant K.D. Const. of Florida, Inc.

### FINAL JUDGMENT (FINDINGS OF FACT AND CONCLUSIONS OF LAW)

ZLOCH, District Judge.

THIS MATTER is before the Court upon a non-jury trial commencing June 29, 1994. The Court heard closing arguments on July 7, 1994. Pursuant to Fed.R.Civ.P. 52, the Court hereby makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. The Plaintiff, Sheila Kelly, is a female citizen of the United States, and a resident of Palm Beach County, Florida.

2. The Defendant, K.D. Construction of Florida, Inc. ("K.D. Construction"), was and is a corporation organized and existing under the laws of the State of Florida. K.D. Construction's principal business is the construction of privately financed multi-residential housing, such as apartment complexes and condominiums. K.D. Construction is also involved in public sector construction.

3. During January 1990, K.D. Construction hired Sheila Kelly as its Comptroller/Office Manager.

4. Prior to accepting the job with K.D. Construction, Sheila Kelly worked for Davis Brothers Construction Company and four affiliated companies, Production Truss Co., Production Products Co., Karma Associates, Inc. and Davco Crane Co. (hereinafter collectively referred to as "Davis Brothers Construction"). Davis Brothers Construction was a family owned business, and Karl Davis was its principal officer.

5. In 1982, Karl Davis hired Sheila Kelly to work at Davis Brothers Construction. She worked directly for Karl Davis and continued to work at Davis Brothers Construction until March 1990. At the time Sheila Kelly left Davis Brothers Construction, she was the Comptroller/Office Manager and earned $75,000.00 annually.

6. In 1989 Karl Davis left Davis Brothers Construction after a dispute with family members about how to operate the business. Karl Davis then formed the Defendant company, K.D. Construction. In January 1990, Karl Davis hired Sheila Kelly at the same salary she was making at Davis Brothers, $75,000.00 annually. At the end of 1990, Karl Davis raised her salary to $80,000.00 per year. Karl Davis testified that he was satisfied with Sheila Kelly's work performance at Davis Brothers Construction and at K.D. Construction, and that she was a good employee.

7. Sheila Kelly did not immediately begin working full-time at K.D. Construction. She

continued working for Davis Brothers Construction in order to train her replacement and assist them in preparing their month-end reports for February and March 1990. She completely left Davis Brothers in late March 1990 to begin full-time employment at K.D. Construction.

8. During July 1990 and September 1990, Sheila Kelly performed additional services for Davis Brothers Construction as an accounting consultant to assist them in preparing their quarter end closing and consolidated tax returns for the periods ending April 30, 1990, and July 31, 1990. K.D. Construction billed Davis Brothers for her services. Sheila Kelly did not receive any money directly from Davis Brothers Construction while K.D. Construction was paying her salary.

9. During September 1990, Sheila Kelly became pregnant. She was not married at the time. The father of her child was Mark Nuccilli, a project supervisor at K.D. Construction. Mark Nuccilli also worked for Davis Brothers Construction at the same time Sheila Kelly worked there. Although he was married, Sheila Kelly had been having an ongoing affair with Mark Nuccilli for five to six years prior to becoming pregnant, while they both worked at Davis Brothers Construction and K.D. Construction.

10. During January 1991, Sheila Kelly told Karl Davis that she was pregnant. Karl Davis seemed happy and surprised when she told him the news. Karl Davis and Sheila Kelly discussed the financial responsibilities of raising a child. Karl Davis also told Sheila Kelly that he would work with her on her maternity leave, but they did not discuss any specifics. Sheila Kelly never told Karl Davis, or any other employee at K.D. Construction, that Mark Nuccilli was the father. Sheila Kelly also never disclosed to Karl Davis that she had been having an affair with Mark Nuccilli.

11. On two separate occasions in March 1991, Karl Davis and Sheila Kelly discussed potential working arrangements for the period when she would be on maternity leave. These meetings included discussions about Sheila Kelly working at home and about her purchasing a computer and modem for her home.

12. In March 1991, some time after the two meetings regarding maternity leave, Glen Madison, a project supervisor at K.D. Construction, sarcastically commented to Karl Davis that if he (Glen Madison) slept with Sheila Kelly, could he make more money. At the time, Glen Madison was making $75,000.00 and Mark Nuccilli was making $100,000.00. Glen Madison thought that Mark Nuccilli was getting preferential treatment because of his relationship with Sheila Kelly. After Glen Madison made the comment, Karl Davis did not say anything to him. Karl Davis testified that this was the first time he learned of the affair between Sheila Kelly and Mark Nuccilli.

13. Karl Davis then attempted to confirm the affair. Specifically, Karl Davis reviewed the company cellular phone records and saw that Sheila Kelly and Mark Nuccilli were spending a lot of time talking on the phone. Also, Karl Davis spoke with John Erikson, another employee at K.D. Construction, who told Karl Davis that Mark Nuccilli was the father of Sheila Kelly's child.

14. During 1985 or 1986, while working at Davis Brothers Construction, Sheila Kelly had an affair with the company vice-president, Steve Casey. When Karl Davis learned of that affair, he was upset, and Sheila Kelly acknowledged that she knew Karl Davis disapproved of such affair. Sheila Kelly testified that Karl Davis told her it was not a good idea for her to get involved with another company employee. Karl Davis testified he told Sheila Kelly the affair with Steve Casey was unacceptable and that he would not stand for it in the future.

15. When Karl Davis learned of the affair between Sheila Kelly and Mark Nuccilli, he was angry. He was specifically concerned because he trusted Sheila Kelly with confidential information, including his personal affairs, and Sheila Kelly knew everything about his business.

16. On Friday, March 29, 1991, Karl Davis called Sheila Kelly into his office and told her that he was laying her off. Sheila Kelly asked him what was the reason for the

layoff and Karl Davis responded, "It's your situation and a lack of work." Sheila Kelly pressed Karl Davis to tell her what he meant by her "situation." Karl Davis then stated, "You're having Mark's child and that is not right." Karl Davis then asked Sheila Kelly directly if Mark was the father. Sheila Kelly answered by saying what difference does it make who the father is. Sheila Kelly also asked Karl Davis how he knew that Mark Nuccilli was the father. Karl Davis did not reply. Sheila Kelly also inquired if he was also going to fire Mark Nuccilli, and Karl Davis responded that it was his decision.

17. Sheila Kelly asked Karl Davis if he had consulted with an attorney, because Karl Davis had met with his attorney earlier that day. Karl Davis responded by asking her if she was going to sue him. Sheila Kelly then stated that he could not fire her because she was pregnant.

18. Karl Davis never offered Sheila Kelly any alternative to the termination of her employment, such as part-time work or a cut in salary. K.D. Construction paid Sheila Kelly six weeks severance, plus two weeks of vacation. There were no other fringe benefits.

19. Karl Davis terminated Mark Nuccilli's employment the following Monday, April 1, 1991. Mark Nuccilli received no severance pay.

20. At the time Sheila Kelly was fired, K.D. Construction's business was slow, but Karl Davis admitted at trial that the lack of work was not the reason for terminating Sheila Kelly's employment. Rather, Karl Davis stated the sole reason for her firing was the affair she had with Mark Nuccilli.

21. Following the firing, Karl Davis assigned several of Sheila Kelly's duties, including the posting of information to the computer and the drawing of checks to pay for materials and subcontractors, to the receptionist. K.D. Construction's accounting firm took over the remaining accounting functions, including preparing the month end statements. In June 1992, K.D. Construction hired a permanent bookkeeper at a salary of $37,000.00 to handle the accounting functions.

22. Sheila Kelly's annual salary with K.D. Construction at the time she was fired was $80,204.80. Following her firing, she looked for work on a regular basis. Sheila Kelly's child was born on June 21, 1991. Sheila Kelly eventually was hired by Guardian Construction Company in November 1991 at an annual salary of $25,000.00. During her job search, Sheila Kelly also performed occasional consulting work for Production Truss and Davis Brothers Construction. In March 1992, she was hired full-time by Production Truss Company. In May 1993 she was also rehired by Davis Brothers Construction, while continuing to do work for Production Truss, an affiliate of Davis Brothers Construction.

23. During her four month tenure at Guardian Construction Company, Sheila Kelly earned a total of $5,762.45. From March 1992 until July 1, 1994, she earned a total of $61,149.03 from her employment with Production Truss. From May 1993 until July 1, 1994, she earned a total of $61,383.61 from her employment with Davis Brothers Construction.

24. After being fired from K.D. Construction, Sheila Kelly also performed independent consulting work for two small businesses. Her self-employment income from this consulting/bookkeeping business totalled $6,427.00.

## II. CONCLUSIONS OF LAW

1. Sheila Kelly brought the instant action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. § 2000e et seq., and the Florida Human Rights Act, Fla.Stat. § 760.10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(4) and 1367 and 42 U.S.C. § 2000e–5(f)(3).

2. Sheila Kelly is an employee within the meaning of Title VII. See 42 U.S.C. § 2000e(f).

3. K.D. Construction is an employer within the meaning of Title VII. See 42 U.S.C. § 2000e(b).

4. Title VII provides that it shall be an unlawful employment practice for an em-

ployer to discharge any individual because of such individual's sex. 42 U.S.C. § 2000e–2(a)(1). Title VII defines the term "because of sex" to include "because of pregnancy." 42 U.S.C. § 2000e(k). In order for Sheila Kelly to prevail in her Title VII claim, she must prove that she was the victim of intentional discrimination. *Saint Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ 5. The Florida Human Rights Act also provides that it shall be an unlawful employment practice for an employer to discharge any individual because of such individual's sex. Fla.Stat. § 760.10. Because the Florida Human Rights Act is patterned after Title VII, federal case law dealing with Title VII also applies to the Florida Human Rights Act. *Brand v. Florida Power Corp.*, 633 So.2d 504, 507 (Fla. 1st DCA 1994); *Florida Dept. of Community Affairs v. Bryant*, 586 So.2d 1205, 1209 (Fla. 1st DCA 1991).

■ 6. Initially, the plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747. The plaintiff may establish a prima facie case by either direct, circumstantial or statistical evidence.

■ 7. Direct evidence is evidence which, if believed, "establishes discriminatory intent without inference or presumption." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir.1993). "Only the most blatant remarks whose intent could only be to discriminate ... constitute direct evidence." *Id.* However, evidence which only *"suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence" is circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir.1990) (emphasis in original).

■ 8. In establishing a prima facie case based on circumstantial evidence, the United States Supreme Court recently clarified the proper allocations of the burden of production and the burden of proof in a Title VII discriminatory-treatment cases. *Saint Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (clari-

fying the allocations scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In order for the Plaintiff to establish a prima facie case for unlawful termination of employment through circumstantial evidence, she must prove the following: (1) she was a member of a protected group; (2) she was qualified for, and adequately performed, her job; (3) she was terminated from that job; and (4) K.D. Construction had a continued need for someone to perform the same work after her employment was terminated. *See, e.g., Id.* at ——, 113 S.Ct. at 2747; *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148 (1st Cir. 1990). "Under the *McDonnell Douglas* scheme, '[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747 (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094).

■ 9. Once the Plaintiff has satisfied her prima facie case, the Defendant, K.D. Construction, then has "the burden of producing an explanation to rebut the prima facie case—i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Id.* (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). In order for the defendant to meet its burden, " '[t]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* (citing *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95). The defendant's burden of production in rebutting the plaintiff's prima facie case "is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994) (citations omitted). " 'If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted,' and 'drops from the case.'" *Hicks*, —— U.S. at

——, 113 S.Ct. at 2747 (citing *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95).

10. "[A]lthough the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). For the Plaintiff to satisfy this ultimate burden of proving intentional discrimination, the Plaintiff "must show that 'a discriminatory reason more likely than not motivated [the adverse employment decision.]'" *Meeks,* 15 F.3d at 1019. In assessing this ultimate burden, this Circuit has held that a plaintiff must prove that the discriminatory reason was a "significant" or "motivating" factor in the employer's adverse decision. *See, e.g., Id.* at 1019; *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1523 (11th Cir.1991) (finding that the discriminatory factor must be a "significant" factor); *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1501–02 (11th Cir.1990) ("[The] burden remains with the plaintiff and is carried with evidence that the plaintiff's engagement in protected activity was a significant factor in the employer's decision."). Therefore, reliance upon an insignificant factor does not warrant relief, but significant reliance on an impermissible factor is a violation. *Bigge,* 894 F.2d at 1502.

11. Finally, in a mixed-motive case, if the Plaintiff meets her burden that an impermissible criterion was a significant or motivating factor in the adverse employment decision, then the burden shifts to the Defendant to prove by a preponderance of the evidence that it would have reached the same decision even absent the improper motive. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 1790–91, 104 L.Ed.2d 268 (1989) (plurality opinion); *Id.* at 261, 109 S.Ct. at 1796 (O'Connor, J., concurring in judgment); *Id.* at 259–60, 109 S.Ct. at 1795–96 (White, J., concurring in judgment); *see also Wallace v. Dunn Construction Co.,* 968 F.2d 1174 (11th Cir.1992).[1]

12. Turning to the instant action, Sheila Kelly has met her initial burden of proving by a preponderance of the evidence a prima facie case of discrimination through circumstantial evidence.[2] First, Sheila Kelly, as a pregnant woman, was a member of a protected group. 42 U.S.C. § 2000e(k). Second, Sheila Kelly was qualified for, and adequately performed, her job. Karl Davis testified that Sheila Kelly was a good employee and he was satisfied with her work performance. Third, on March 29, 1991, Sheila Kelly's employment was terminated. Finally, K.D. Construction had a continued need for someone to complete the responsibilities of Sheila Kelly's job.

13. K.D. Construction has satisfied its burden of producing a legitimate, nondiscriminatory explanation to rebut Sheila Kelly's prima facie case. Karl Davis testified that he fired Sheila Kelly because she was

---

1. As part of the Civil Rights Act of 1991, the Congress effectively overruled this portion of the *Hopkins* holding as it relates to liability. Specifically, Section 107, Clarifying Prohibition Against Impermissible Consideration Of Race, Color, Religion, Sex, Or National Origin In Employment Practices, amended Section 703 of the Civil Rights Act of 1964 by adding the following new subsection:

   (m) Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

   42 U.S.C. § 2000e–2(m). However, the effective date of this section was November 21, 1991, which was subsequent to the alleged discrimina-

tory conduct in the instant case. This section of the Civil Rights Act of 1991 does not apply retroactively. *See Hook v. Ernst & Young,* 28 F.3d 366 (3d Cir.1994); *see also Preston v. Virginia,* 31 F.3d 203 (4th Cir.1994).

2. The Plaintiff asserts she has also introduced direct evidence of discrimination. Specifically, the Plaintiff points to the statements made by Karl Davis that he was terminating the Plaintiff's employment because of her "situation" and that she "was having Mark's child and that's not right." However, a reasonable inference from these statements is that the "situation" referred to the Plaintiff's affair with Mark Nuccilli, and that the affair "was not right." Therefore, these are not statements whose intent could only be construed as discrimination against the Plaintiff because she was pregnant. *See Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1226 (11th Cir.1993).

having an affair with another high level company employee.[3] In particular, Karl Davis was concerned about the affair between Sheila Kelly and Mark Nuccilli, because Sheila Kelly was someone with whom he had trusted with confidential information including his personal finances. This Court concludes that K.D. Construction has produced a "legitimate, nondiscriminatory reason" for terminating Sheila Kelly's employment. *See, e.g., Platner v. Cash & Thomas Contractors, Inc.,* 908 F.2d 902, 904 (11th Cir.1990) ("[I]t is clear that sexual activity, rather than sexual identity as such, is not a discriminatory basis for employment action under Title VII.") (citations omitted).[4] Consequently, the presumption that K.D. Construction unlawfully discriminated against Sheila Kelly has been rebutted.

■ 14. Sheila Kelly has failed to satisfy her ultimate burden of proving, by a preponderance of the evidence, that K.D. Construction terminated her employment because she was pregnant, or that her pregnancy was a "significant" or "motivating" factor in the employment decision. This Court acknowledges that Sheila Kelly's pregnancy may have been a factor in the eventual termination of her employment, in that Karl Davis may not have learned of the affair between Sheila Kelly and Mark Nuccilli if she had not become pregnant. However, even this is debatable because Glen Madison's comment regarding the affair was not directed at Sheila Kelly's pregnancy, but instead related to his perception that Mark Nuccilli was receiving preferential treatment. This Court notes that at most Sheila Kelly's pregnancy was only an insignificant factor in her firing and that reliance upon an insignificant factor does not warrant relief under Title VII. *See Bigge,* 894 F.2d at 1502.

This Court holds that the only significant or motivating factor in K.D. Construction's decision to terminate Sheila Kelly's employment was her affair with Mark Nuccilli, a high level employee with K.D. Construction. It is undisputed that Sheila Kelly had an ongoing affair with Mark Nuccilli, and that Sheila Kelly never disclosed this affair to Karl Davis, even after she became pregnant. It was shortly after Karl Davis learned of this affair that he fired both Sheila Kelly and Mark Nuccilli.

Sheila Kelly argues that there was no directive at K.D. Construction against dating other company employees. However, it is also undisputed that during 1985 or 1986, while at Davis Brothers Construction, Sheila Kelly had an affair with another high level company employee, Steve Casey, the company vice-president. Sheila Kelly concedes that when Karl Davis learned of her affair with Steve Casey, Karl Davis was upset. Sheila Kelly also admitted at trial that Karl Davis told her it was not a good idea for her to get involved with another company employee. Further, Karl Davis testified he told Sheila Kelly the affair was unacceptable and that he would not stand for it in the future. Regardless of whether there existed a specific directive against dating other company employees, Sheila Kelly knew that Karl Davis disapproved of such affairs.

Sheila Kelly further argues that the affair between her and Mark Nuccilli was common knowledge at K.D. Construction, and therefore, Karl Davis must have known of the affair. However, Sheila Kelly has introduced no evidence that Karl Davis ever knew of the affair prior to Glen Madison's comments to Karl Davis in March 1991. Rather, the evidence demonstrates that Sheila Kelly concealed her affair with Mark Nuccilli and continued to conceal the affair until her employment was terminated.

In particular, Sheila Kelly's own testimony was that she never told Karl Davis about her affair with Mark Nuccilli. In fact, when

---

3. Counsel for K.D. Construction asserted the following additional reasons why the Plaintiff's employment was terminated: lack of work, decrease in the quality of the Plaintiff's work performance, insubordination, and disruption of business. In light of the testimony of Karl Davis at trial, the Court finds these reasons are all without merit.

4. In *Platner,* the court noted that "an employer may not, simply on grounds of gender, punish the female but not the male participant in a real or suspected inter-employee liaison." *Platner,* 908 F.2d at 904. In the instant action, the Plaintiff does not allege that she was treated differently from Mark Nuccilli, and this Court notes that Sheila Kelly and Mark Nuccilli were both fired.

Sheila Kelly told Karl Davis that she was pregnant, she never disclosed that Mark Nuccilli was the father. Further, on March 29, 1991, at the time Karl Davis terminated her employment, Karl Davis specifically asked Sheila Kelly if Mark was the father. Instead of conceding this fact, she responded by asking what difference does it make who the father is. She also asked Karl Davis how he knew that Mark was the father. This comment in and of itself evidences that Sheila Kelly believed that Karl Davis did not know of her affair with Mark Nuccilli. It is clear to this Court that the Plaintiff was concerned that she may lose her job if Karl Davis learned about her affair with Mark Nuccilli. This is precisely what happened.

Therefore, this Court finds that the Plaintiff, Sheila Kelly, has failed to prove by a preponderance of the evidence that K.D. Construction intentionally discriminated against her when her employment was terminated.

15. Alternatively, assuming arguendo that pregnancy was a motivating factor in the employment decision, based on the foregoing reasons, K.D. Construction has proven by a preponderance of the evidence that it would have terminated Sheila Kelly's employment even if she was not pregnant.

Accordingly, after due consideration, it is

**ADJUDGED** that Final Judgment be and the same is hereby entered in favor of the Defendant, K.D. Construction of Florida, Inc., and against the Plaintiff, Sheila Kelly. The Plaintiff, Sheila Kelly, shall take nothing by this action and the Defendant, K.D. Construction of Florida, Inc., shall go hence without day.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Court retains jurisdiction of the above-styled cause upon the filing of an appropriate motion for the award of attorneys fees and costs.

**DONE AND ORDERED.**