Maryline **LAROCHE, Alma Waters, Aaron Wright, Daniel Carpenter, Vickie Kendrick, Francis Tulino, Nicole Channer, Clifford Fortner, and Sylvia Clinch, Plaintiffs,**

v.

**DENNY'S INC. and Advantica Restaurant Group f/k/a Flagstar Companies, Inc., Defendants.**

**No. 98–0654–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

Aug. 19, 1999.

Robert E. Weisberg, Kimberly A. McCoy, Law Offices of Robert E. Weisberg, Coral Gables, FL, Leslie W. Langbein, Langbein & Langbein, P.A., Aventura, FL, for Plaintiffs.

Jon K. Stage, Akerman, Senterfitt & Eidson, P.A., Fort Lauderdale, FL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SEITZ, District Judge.

At the parties' joint request, this case came before the Court for a non-jury trial July 26 through 30, and August 2, 1999, to determine whether race was the motivating factor in the Defendant Denny's Inc.'s manager's actions on January 2, 1998. Having received documentary and testimonial evidence, having considered the demeanor and credibility of each witness, having heard arguments of counsel, and being otherwise fully advised in the premises, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

This suit has its genesis in a short encounter that occurred in the early morning hours of January 2, 1998 at a Denny's restaurant located on S.W. 8th Street in Miami, Florida ("Unit No. 1895"). The Court has found the factual determinations difficult because the parties have diametrically opposed versions of what happened and the key player in the encounter, the manager Carlos Ibarra, did not testify. The Court attributes most of the testimonial inconsistencies to the fact that eleven

people [1] were looking at the same heated event from their own subjective perspective and thus saw, heard, interpreted and recalled the event differently. In making the following factual determinations, the Court has given special consideration to the testimony of the three disinterested witnesses, Mr. Raposo, Sgt. Bennett and Ms. Evlogimenos, and concludes the truth lies somewhere in between the parties' conflicting versions.

On January 2, 1998, Plaintiffs Maryline Laroche, Alma Waters, Aaron Wright, Daniel Carpenter, Vickie Kendrick, Francis Tulino, Nicole Channer, Clifford Fortner, and Sylvia Clinch, were correctional officers at the Everglades Correctional Institution, a maximum security facility located in Miami–Dade County, Florida. Plaintiffs Laroche, Wright, Kendrick, Channer, Fortner and Clinch are African American. Plaintiffs Waters, Carpenter and Tulino are Caucasian. Defendant Denny's Inc. is the owner of the Denny's restaurant in question. Defendant Advantica Restaurant Group f/k/a Flagstar Companies, Inc. is the holding company for Denny's, Inc.[2]

The Plaintiffs, all wearing their correctional officer uniforms, went to Denny's Unit No. 1895 to celebrate the holidays after the end of their 4:00 p.m. to 12:00 a.m. work shift at the prison. Plaintiffs Laroche, Fortner and Carpenter were the first to arrive at approximately 12:30 a.m. Mr. Jean Ketner, the restaurant host [3] that evening, greeted them in a friendly manner. The three Plaintiffs indicated that more correctional officers would be arriving and asked that they be seated in the back dining room (dining room no. 2) where the tables could be pushed together. As the remaining officers arrived, Mr. Ketner picked up menus and proceeded to the back tables in the second dining room. At that time, Mr. Ketner informed the correctional officers that the restaurant was out of food.[4] The Plaintiffs, who observed the cooks preparing food in the kitchen and observed other customers being served, were surprised and questioned Mr. Ketner on the veracity of his statement. Plaintiff Fortner remarked about his December 19, 1997 visit during which he had been told that the "stove was broken." [5] He asked if they wouldn't be entitled to some type of rain check or coupon. Plaintiffs were not

---

1. Those who actually witnessed the encounter were the nine plaintiffs, the restaurant's host, Mr. Jean Ketner, and the guest, Mr. Raposo. Sgt. Bennett and the server, Ms. Evlogimenos, did not witness the encounter itself. Sgt. Bennett saw the Plaintiffs immediately after the encounter, outside the restaurant. He testified the Plaintiffs did not appear to be upset. In particular, he did not observe Sgt. Waters crying. A video camera was focused on the cashier and waiting area, which was part of the area where the events unfolded. Denny's could not produce the video tape from that evening.

2. At the close of all the evidence, Defendants made a motion for judgment as a matter of law as to Defendant Advantica on the basis of a complete lack of evidence as to any wrongdoing by that Defendant. Plaintiffs conceded the argument, and the Defendants' motion as to Defendant Advantica was granted. Hence, final judgment in favor of Advantica will issue under separate order. This matter is now before the Court solely as to the liability, if any, of Defendant Denny's, Inc. for the events in question.

3. Mr. Ketner is a Haitian of African ancestry.

4. Ms. Evlogimenos, a Denny's employee, testified that Mr. Ketner told her that he told the Plaintiffs that the restaurant was out of food. The Court found her testimony in this regard very credible. One of the Plaintiffs testified they saw Mr. Ibarra whisper something to Mr. Ketner immediately before he said the restaurant was out of food.

5. On December 19, 1997, Plaintiffs Fortner, Kendrick and Wright (all African American), visited Unit No. 1895 after working their 4:00 p.m. to 12:00 a.m. shift. The Plaintiffs were told by a Denny's employee that the "stove was broken." In fact, however, the stove was not broken. The Plaintiffs left the restaurant. By Amended Order dated July 26, 1999, the Court granted summary judgment in favor of the Defendants as to this incident, finding there was insufficient evidence to support the elements of the claim that the impetus for this incident was the Plaintiffs' race.

satisfied with Mr. Ketner's responses and demanded to see the manager. Mr. Ketner testified that in these discussions the Plaintiffs began "yelling profanity" at him and were "acting like teenagers."

The graveyard manager of three months, Carlos Ibarra, came over to the group. Mr. Ibarra also informed the Plaintiffs that the supply truck had not arrived, so they were out of food. The discussion escalated. Mr. Raposo, who was sitting with his date in a booth along the perimeter wall, saw but could not hear the exchange. He described the Plaintiffs as aggressive, "in the manager's face," and the situation as very tense. The parties agree that in this exchange, Mr. Ibarra told the Plaintiffs they could call the restaurant chain's 1–800 number [6] if Plaintiffs had a complaint. Ultimately, the manager told the Plaintiffs that he would not speak with them any further, the restaurant was closed and that they would have to leave. He walked the Plaintiffs out and locked the door.

While they were being shown the door, seven of the Plaintiffs testified that Manager Ibarra said "you don't look right together." One of the Plaintiffs testified it was Mr. Ketner who made the statement. The remaining Plaintiff did not hear either say the statement. He only heard Mr. Fortner later say that the manager had spoken those words. At trial, six Plaintiffs testified they heard the comment "you don't look right together" at least once; Officer Fortner testified he heard it from four to seven times.

The plaintiffs remained for a while out in the parking lot deciding what to do. Plaintiff Laroche called the restaurant from her cellular phone to determine whether the restaurant was truly closed. She was advised that the restaurant was open, but was out of some items. While standing in the parking lot, the Plaintiffs testified they observed a group of five or six Hispanic white women arrive. The manager unlocked the doors and admitted the women. Plaintiffs Laroche, Kendrick and Fortner all re-entered the restaurant in an effort to learn the reason why the manager had asked them to leave. The manager again told the Plaintiffs to call the 1–800 number and either refused to speak to them further or only said "you don't look right together" and that they needed to "leave." While standing outside, the Plaintiffs did not observe any other African American customers inside Unit No. 1895. After leaving Unit No. 1895, Plaintiffs Fortner, Kendrick and Wright went to the Miami Lakes Denny's and ate. The other Plaintiffs went home.

In the early afternoon of January 2nd, Plaintiffs Fortner, Kendrick, Laroche and Wright called Denny's 1–800 number, at 11:56 p.m., 12:30 p.m., 1:46 p.m. and 2:09 p.m., respectively. On January 3, 1998, at 9:11 a.m., Plaintiff Channer called the 1–800 number. On January 5, 1998, Plaintiffs Waters, Tulino and Clinch called at 12:30 p.m., 12:48 p.m. and 2:56 p.m., respectively. Their calls were referred to the Civil Rights Monitor. Plaintiff Carpenter, who called to the other Plaintiffs' attention the fact that no African Americans were in the restaurant, did not call the 1–800 number. In their 1–800 calls, the Plaintiffs indicated they felt they were not served because of their race. However, it is not clear that any mentioned the "you don't look right together" statement.

---

**6.** In front of the cashier was a sign which had two 1–800 numbers. The notice with the first number said: "Denny's Promises to Provide to each of Our Customers: Consistently Good Food, Fast, Friendly, and Efficient Service, Clean Restaurants. If you have a compliment, suggestion or complaint—Please tell the manager. However, if you have a problem that is not resolved to your satisfaction, please call our toll free number: 1–800–733–

6697." Below this notice, in capital letters, the sign said: "Denny's IS COMMITTED TO PROVIDING THE BEST POSSIBLE SERVICE TO ALL CUSTOMERS REGARDLESS OF RACE, COLOR, CREED OR NATIONAL ORIGIN. If you have complaints or questions for our Civil Rights Monitor, please call 1–800–827–9315. Our goal is to be the best food service company in the world."

The Plaintiffs did attribute the statement to the manager in media interviews, including those which were broadcast on January 7th.[7] In the TV clips showing the mixed race group of correctional officers, at least two of the plaintiffs stated they did not understand what was meant by the statement "you don't look right together."

Upon learning of the media stories, Denny's suspended Mr. Ibarra. It also asked the Office of the Civil Rights Monitor, created pursuant to prior Consent Decrees, for permission to conduct an investigation itself.[8] Permission was granted and an investigator, Clifford Chase, was immediately dispatched from California.[9] On January 22, 1998, Denny's investigator submitted the results of his investigation. He had not shared his findings with anyone before submitting them. Other than the newspaper articles, Mr. Chase did not have any input from the Plaintiffs because when he contacted those mentioned in the articles, they said they had retained an attorney. Three days before the issuance of their investigator's report, on January 19, 1998, Denny's regional manager terminated Mr. Ibarra.[10] At the time of trial, Mr. Ketner was also no longer working for Denny's Inc.

Although the capacity of Unit No. 1895 is 143 customers, between midnight and 1:00 a.m. on January 2, 1998, the restaurant's records demonstrate eight customers paid for a meal. The same number paid for meals between 1:00 a.m. and 2:00 a.m. that morning. Mr. Raposo also described the restaurant traffic at the time as "sparse." The restaurant was out of some food items because the supply truck did not deliver on January 1st due to the holiday, and the general manager failed to order sufficient supplies to provide for this circumstance.

The only server on duty in the early morning hours of January 2, 1998, was Ms. Joanna Evlogimenos. She testified that she had come to the restaurant early because it had been a busy day and the restaurant was short of help. She also stated that when she would explain to customers the numerous food items which were unavailable, some of the customers responded angrily and left the restaurant. She also testified that all genders and races had been seated and served at Denny's before and after the Plaintiffs' visit on January 2, 1998. Other than at the time of the Plaintiffs' visit to Unit No. 1895, mixed race groups of black and white customers had been seated and served at that Denny's location. The Court finds Ms. Evlogimenos' testimony in this regard very credible.

7. Mr. Fortner contacted the media.

8. The consent decrees were entered in 1994 in a California and a Maryland lawsuit. Initially, under the decrees, Denny's was prohibited from investigating a civil rights complaint. The Civil Rights Monitor was required to conduct all investigations. This limitation was modified approximately two years ago. Mr. Clifford Chase, who formerly worked for the Civil Rights Monitor, is now employed by Advantica to investigate civil rights complaints.

9. When Mr. Chase arrived at the restaurant on January 8th, he asked to see the videotape of the cashier/waiting area for that night. The camera could have captured the Plaintiffs' and manager's exchange in this area. He was not given it nor given an explanation of why it was not available. Whereas in a separate hearing, the magistrate judge found there was no evidence of bad faith sufficient to justify an instruction of a negative inference of destruction of evidence, the Court admitted evidence regarding the missing video as it has some probative value of the care with which this Denny's management ensured Denny's Inc. protocol and procedures were followed.

10. The first paragraph of Mr. Ibarra's termination notice states that the investigation determined "there was no sufficient cause to the allegations of discriminations (sic)." The second paragraph stated that during the investigation, it was determined that he closed the restaurant doors in violation of company policy and that he denied ever closing the doors during the shift. Closing the restaurant doors is grounds for termination. This was the stated reason for Mr. Ibarra's termination.

Plaintiffs Laroche, Waters, Wright, Carpenter, Kendrick, Tulino, Fortner and Clinch had all visited a Denny's restaurant prior to the January 2, 1998 visit and, with the exception of the three who visited Unit No. 1895 on December 19, 1997, they had no problems and never felt that they were treated inappropriately or differently because of their race. Six of the nine Plaintiffs have not visited any Denny's restaurant since January 2, 1998. Other than the December 19, 1997 and January 2, 1998 experiences at Unit No. 1895, the Plaintiffs do not claim that Denny's is presently discriminating against them. None of the Plaintiffs have suffered any tangible, actual or long-term injury as a result of this incident. While they all testified they were humiliated and embarrassed, most of the Plaintiffs testified that the goal of the lawsuit was to ensure that Denny's took action so that others would not be treated as they were.

Pursuant to the Consent Decrees, Denny's provided training to Mr. Ibarra and Mr. Ketner regarding Denny's clear and explicit public accommodations and non-discrimination policies. Mr. Ibarra, as manager, received two separate training sessions totaling 16 hours. Mr. Ketner viewed the training video provided for line employees.

From all accounts, it appears that Mr. Ibarra did not react well to stressful situations and, in general, should not have been in the position of an unsupervised manager. While Denny's argues the fact that Mr. Ibarra told the Plaintiffs to call the 1–800 number is circumstantial evidence that he was not acting in a discriminatory manner, the Court finds this act does not outweigh the inference flowing from the fact that Mr. Ibarra frequently and blatantly violated a number of Denny's policies. Examples include his improper locking of the restaurant doors, even though this was a terminable act; his failure to follow company procedures regarding customer incident reports;[11] and his failure to follow Denny's explicit "Don't fight, Make it Right" instructions for handling customer complaints. Based on the Court's ability to assess the witnesses who did testify, the Court finds it is more likely than not that Mr. Ibarra, as part of his "customer traffic control practices," instructed Mr. Ketner to tell guests "the stove was broken" or other false reasons that service was not available, in violation of Denny's Public Accommodation Policy, Paragraph 14.[12] Furthermore, while Mr. Ibarra did not testify at the trial, the Court finds, based on the exhibits admitted into evidence, that he lied when he told his supervisors he did not lock the restaurant door and was not truthful about the customer traffic at the time of the incident. Thus, there is, more likely than not, the reasonable inference that he violated Denny's non-discrimination policy and lied to Denny's about that fact as well.

In assessing the credibility of the witnesses, there was trial testimony suggesting that two of the Plaintiffs saw this suit as a vehicle for financial gain. The Court would be surprised if this did not play a part in the Plaintiffs' motives. However, the Court finds that Plaintiffs genuinely feel Mr. Ibarra discriminated against them. Denny's failure to respond in any corporate fashion prior to media coverage of the incident did not help to reduce these feelings. Furthermore, the press release by Denny's President, Mr. Romandetti, probably exacerbated the situation. Mr.

---

**11.** If a manager confronts an incident involving offensive, disruptive or abusive customers, Denny's service policies for handling such situations require the manager to document the event and file it for easy retrieval. Although Mr. Ketner testified he spent up to thirty minutes with Mr. Ibarra after the Plaintiffs left, the only documentation of the encounter was Mr. Ketner's brief "memorandum of record." Mr. Ibarra made no mention of the matter in the manager's log.

**12.** Paragraph 14 of Denny's Public Accommodation Policies provides "Do not indicate to any person that service or enjoyment of our restaurants is not available when this is not true."

Romandetti's release states that Denny's investigation found that the restaurant was very busy, notwithstanding the fact that its own internal records did not support this statement. Also, the press release, while conceding that Mr. Ibarra locked the doors during the incident, explains this action as merely "an inappropriate way to, control the flow of customers into the restaurant." The press release then states the corrections officers were verbally abusive and chastises the Plaintiffs for such conduct. While the Court recognizes that this encounter had all of the elements that guaranteed heated emotions and potential serious mis-communication as well as personality and cultural clashes,[13] after weighing all of the evidence, the Court finds that it is more likely than not that the Plaintiffs did not engage in the torrent of profanity Mr. Ketner described.

### CONCLUSIONS OF LAW

This action for alleged race-based discrimination in public accommodations, is brought pursuant to Title II of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000a *et seq.;* 42 U.S.C. § 1981; and the Florida Civil Rights Act of 1992, Section 760.01 *et seq.,* Florida Statutes. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

■ The parties have stipulated, and the Court agrees, that the Supreme Court's shifting-burden analysis adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for Title VII discrimination cases is applicable in public accommodation cases. *See Hornick v. Noyes,* 708 F.2d 321, 325, n. 8 (7th Cir.1983), *cert. denied,* 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984) (Title II case); *Peterson v. BMI Refractories,* 132 F.3d 1405,

1412 (11th Cir.1998) (Section 1981 cases); *Kelly v. K.D. Constr. of Fla., Inc.,* 866 F.Supp. 1406, 1411 (S.D.Fla.1994)(FCRA case).

■ Under the *McDonnell Douglas* framework, as further elucidated in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Plaintiffs must first prove by a preponderance of the evidence a prima facie case of discrimination. Specifically, the Plaintiffs must prove that: (1) they are members of a protected class; (2) they attempted to contract for services and to afford themselves the full benefits and enjoyment of a public accommodation; (3) they were denied the right to contract for those services and, thus, were denied the full benefits or enjoyment of a public accommodation; and (4) such services were available to similarly situated persons outside the protected class who received full benefits or enjoyment, or were treated better. *United States v. Lansdowne Swim Club,* 894 F.2d 83, 88 (3d Cir.1990).

■ Once the Plaintiffs meet this burden, they establish a presumption of intentional discrimination. *Hicks,* 509 U.S. at 506, 113 S.Ct. 2742. The effect of this presumption shifts the burden to the Defendant to produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Id.* at 506–07, 113 S.Ct. 2742; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. The Defendant's burden of production is a light one. *Batey v. Stone,* 24 F.3d 1330, 1334 (11th Cir.1994).

■ When a defendant meets its burden of production, the presumption of discrimination which the *McDonnell Douglas* framework creates, "drops from the case"

---

13. Indeed, in viewing the demeanor of the trial witnesses, in addition to observing Mr. Ketner's obvious strong feelings against the Plaintiffs, particularly Plaintiffs Kendrick and

Fortner, the Court also observed that the Plaintiffs had particularly hostile feelings towards the Latin manager as opposed to the Haitian host, Mr. Ketner.

and "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255, n. 10, 101 S.Ct. 1089. The burden then shifts back to the Plaintiffs to demonstrate that the Defendant's actions were not for the proffered reason but were, in fact, motivated by race. *Hicks*, 509 U.S. at 507–08, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Plaintiffs may prove this fact either by means of affirmative evidence that race played an impermissible role in Mr. Ibarra's action, or by showing that the proffered nondiscriminatory reason does not merit credence. *Id.* at 256, 101 S.Ct. 1089. The ultimate burden is on the Plaintiffs to prove that they were the victims of intentional discrimination.

■ In the present case, the Court ruled at the end of the Plaintiffs' case that they had met their initial burden of establishing a prima facie case of discrimination. The Plaintiffs produced the same evidence that the Court considered in its July 26, 1999 Amended Order on Motion for Summary Judgment. At the end of the Denny's case, the Court likewise concluded that Denny's met its burden of production. Denny's introduced evidence from which one could infer that the Plaintiffs' were not served because Denny's overworked, stressed manager and host declined to serve customers who became verbally abusive upon learning that the restaurant was out of some food items.

■ The case is now at the *Burdine* juncture where "the factual inquiry proceeds to a new level of specificity." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). In deciding whether the Plaintiffs have met their ultimate burden of proving Denny's manager's[14] expulsion of the Plaintiffs was racially motived, the Court has consider all of the evidence, including the previously produced evidence establishing the prima facie case. The Court finds the Plaintiffs have met their burden.

The Court finds that Denny's explanation is not sufficiently credible, considering all the evidence produced at trial. While there is evidence which leads the Court to conclude that at least one of the Plaintiffs conducted himself in an angry, "in the manager's face" fashion, the opportunity to observe the witnesses also leads the Court to conclude the Plaintiffs did not abusively attack Mr. Ibarra and Mr. Ketner using a profanity every other word. Additionally, at the time the Plaintiffs arrived, there were very few customers in the restaurant. And while the restaurant was out of some food items, the Court finds the greater weight of the evidence supports the conclusion that the Plaintiffs were initially falsely told the restaurant was "out of food."

Although Denny's argues that Mr. Ibarra's policy-violating customer control techniques were indiscriminately applied, the only evidence at trial of his use of these

---

14. Denny's is liable for the actions of its manager pursuant to Section 219(1)(d) of the Restatement (Second) of Agency which provides: "the employee…was aided in accomplishing the tort by the existence of the agency relationship." There was evidence that the General Manager had been informed of Mr. Ibarra's policy violations during his three months of managing the graveyard shift. But for Denny's failure to supervise Mr. Ibarra better, he would not have been in the position to refuse to serve the Plaintiffs, to require them to leave, and to lock the doors behind them. Denny's maintains that the recent Supreme Court decisions in *Faragher v. City of Boca Raton* and *Burlington Indus., Inc., v. Ellerth* provide an affirmative defense to companies that exercise reasonable care to prevent and correct promptly discriminatory behavior on the part of their employees. *Faragher*, 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); *Burlington Indus.*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Denny's maintains that its 1–800 number, its investigation, and prompt termination of Mr. Ibarra bring it within the *Faragher/Burlington* affirmative defense. The Court finds, however, that in public accommodation cases, the immediacy of the refusal to serve and the need to provide incentives to ensure a vigilant compliance with the law make the *Faragher/Burlington* defense inapplicable in this public accommodation case.

**1384**

practices were the December 19th incident involving three African American Plaintiffs and this incident involving the entire group of Plaintiffs, the majority of whom were African American. Furthermore, Mr. Ibarra admitted five or six Hispanic females after locking out the Plaintiffs. A defendant who acts with no racial animosity but who makes decisions on the basis of race can be held liable for intentional discrimination. *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 473 (11th Cir.1999). These facts, combined with Mr. Ibarra's failure to follow Denny's "Don't fight, Make it right" policy, his refusal to speak with the Plaintiffs further, except to tell them to leave, his locking the door behind them, then lying about this easily provable fact, provide a foundation for the inference that Mr. Ibarra also violated Denny's non-discrimination policy in this instance.

The Court is aware that there are seldom eyewitnesses to an individual's mental processes. The evidence solidifying the conclusion that the manager's actions were racially based is Mr. Ibarra's statement "you don't look right together." [15] This phrase itself has no historical race-based meaning. Indeed, the Plaintiffs, in their television news broadcast, stated that they did not understand the meaning of this statement. Even Mr. Fortner, who testified he heard it four to seven times, also testified he asked the manager what he meant by the statement. However, in this case, given the fact that all nine officers were in uniforms, one of the purposes of which is to make individuals look alike, the fact that the manager said "you don't look right together," suggests that he was referring negatively to the group's racially-mixed composition. No other interpretation has been offered.

The final question is whether such a comment is sufficient to satisfy the Plaintiffs' burden to prove that the manager's decision of refusing to serve them was race based. The Plaintiffs' burden is weighed by the preponderance of the evidence standard. To prevail, the Plaintiffs only have to tip the scale to their side.

It is unfortunate that one rouge manager can tarnish Denny's noteworthy efforts to ensure that all its guests are treated with dignity and respect, and in a fashion that does not discriminate on the basis of race or color in accord with the important national policy reflected in the prohibitions against discrimination contained in the Civil Rights Act of 1964. Discrimination is often simply masked in subtle forms, and it is always easier to assume a less odious intention to what is in reality discriminatory behavior. Thus, courts must be vigilant to insure that a plaintiff has the ability to prove discrimination, even if circumstantially. The burden of proving intentional discrimination ultimately rests with the plaintiff. Although a close question in this case, after weighing all of the evidence in the case, the Court concludes that there is sufficient evidence to satisfy the Plaintiffs' burden of proving that the manager's decision to expel the Plaintiffs was racially motivated, rather than just a stressed manager's response to aggressively upset customers. Thus, Mr. Ibarra's action violated Denny's discrimination policy as well as federal and Florida law. Pursuant to Section 219(1)(d) of the Restatement (Second) of Agency, the Court concludes that Denny's, Inc. is liable for this action.

### DAMAGES

Turning to the issue of damages, the Plaintiffs have not shown actual, tangible or long-term injuries. Whereas they all testified that they were humiliated and embarrassed, which satisfies the requirements for an award of compensatory damages, it is obvious that the impact of the

15. One of the Plaintiffs testified Mr. Ketner made this statement. While it is possible that if Mr. Ketner were the speaker, he did not say these words given his poor command of the English language and his heavy accent, the Court concludes the greater weight of the evidence is that Mr. Ibarra made the statement albeit not as frequently as some of the Plaintiffs testified.

incident was minimal. It was a less than 10 minute encounter, in a sparsely populated restaurant. Sgt. Bennett testified that the Plaintiffs did not appear to be upset nor did he see any of them crying in the parking lot. Three of the Plaintiffs left this Denny's restaurant and ate at the Denny's in Miami Lakes. At trial, a majority of the plaintiffs testified their goal was essentially to induce Denny's to take greater action to ensure compliance with its public accommodations policies. For these reasons, the Court will award each Plaintiff $300 in compensatory damages on their claims under § 1981 and the Florida Civil Rights Act of 1992, Section 760.01 *et seq.*, Florida Statutes.

### TITLE II CLAIM

On the Plaintiffs' Title II claim, the Court finds that the Plaintiffs have not demonstrated any basis to justify injunctive relief. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In particular, they have not demonstrated immediate irreparable harm or the lack of any alternative remedy. Thus, judgment will be entered for Denny's, Inc. on this claim.

### CONCLUSION

For the reasons set out above, the Court will enter final judgment in accordance with this opinion by separate order pursuant to FED. R. CIV. P. 58.