A. Kathryn CALLWOOD,
et al., Plaintiffs,

v.

DAVE & BUSTER'S, INC.,
et al., Defendants.

Lisa M. Gilbert, et al., Plaintiffs,

v.

Dave & Buster's Inc., et
al., Defendants.

Nos. CIV. AMD 98–1441,
CIV. AMD 98–887.

United States District Court,
D. Maryland.

June 7, 2000.

Curtis J. Karpel, Silver Spring, MD, for Plaintiffs.

Arthur F. Fergenson, Ballard, Spahr, et al., Baltimore, MD, Maureen M. Rayborn, Ballard, Spahr, et al., Philadelphia, PA, Gayle B. Stein, Ballard Spahr Andrews & Ingersoll PH, Philadelphia, PA, for Defendants.

## MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

The plaintiffs in these cases, transferred to this court from the United States Dis-

trict Court for the District of Columbia where they were instituted, are two unrelated groups of African–Americans. The first group consists of eight members (collectively, the "Callwoods"); [1] the second group consists of eleven members (collectively, the "Gilberts").[2] The defendant, Dave & Buster's, Inc., is a Missouri corporation which operates an eating, drinking, arcade-game and entertainment complex in Bethesda, Maryland (hereafter, "the restaurant").[3]

Several of the adult members of each of the plaintiff groups, the Callwoods during a May 24, 1997, visit, and the Gilberts during an April 20, 1997, visit, experienced what they perceived as extraordinarily discourteous and hostile treatment from the staff and management of the restaurant (the Callwoods were eventually ejected from the restaurant before they ordered their meals), which they attribute to racial animus on the part of defendant's employees.[4] Thus, the Callwoods and the Gilberts have asserted claims under 42 U.S.C. § 1981 and Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3. Jurisdiction exists under 28 U.S.C. §§ 1331 and 1343. The cases were consolidated for discovery, which has concluded. Now pending are defendant's motions for summary judgment. The parties have fully briefed the issues presented and no hearing is deemed necessary. For the reasons set forth below, I shall deny the motion with respect to the Callwoods' claims and grant the motion as to the claims asserted by the Gilberts.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *See id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse

---

1. Named in the Complaint are: A. Kathryn Callwood, Dr. Mark A. Harrison, Sr., Dr. Hortense Harrison, Ens. Mark A. Harrison, Jr., Chimesa Harrison, Gerald Fauntroy, Sr., and two minors, Eion Callwood and Horace Callwood, by their aunt, A. Kathryn Callwood. In response to defendant's proper objection that the minor Callwoods could not be represented by their aunt, their father, Horace Callwood, has been substituted.

2. Named in the Complaint are: Lisa Gilbert, George Gilbert, Jr., Michelle Walters, Andre Andrews, Lisa Andrews, Mekisha Nash, Chanda Hutcherson, Tamara Golphin, Tanisha James, Tiajuana James and Terri Brantley.

3. Plaintiffs originally sued both Dave & Buster's, Inc., and Dave & Buster's of Maryland, Inc. The parties now agree that the latter entity exists solely for purposes of certain licensing functions required by the State of Maryland and may be dismissed from these actions.

4. Defendant has raised no issue, and there is no dispute of fact, as to whether defendant's employees were at all times acting within the scope of their employment and on behalf of defendant.

party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

Defendant seems to contend that the Fourth Circuit's decision in *Wyatt v. Security Inn Food & Beverage*, 819 F.2d 69 (4th Cir.1987), imposes in section 1981 and Title II cases a greater burden of production on nonmovant-plaintiffs—a showing of "substantial evidence"—than is otherwise required at the summary judgment stage. Plaintiffs have seemingly accepted this reading of *Wyatt* and have argued that they have presented "substantial evidence" of defendant's discriminatory intent. To the extent the parties have assumed that *Wyatt* imposes on nonmovant-plaintiffs a burden of producing "substantial evidence" at the summary judgment stage, I shall clarify.

In *Wyatt*, as here, the nonmovant-plaintiffs asserted claims under 42 U.S.C. §§ 1981 and 2000a against a hotel lounge. The Fourth Circuit reviewed the trial court's denial of the defendant's motion, made pursuant to Fed.R.Civ.P. 50, for a judgment as a matter of law (formerly, "judgment n.o.v.," *see* Fed.R.Civ.P. 50 (advisory committee note on 1991 amendment, subsection (a))). The Court ultimately concluded that the plaintiffs had offered "at least five kinds of 'substantial evidence' to support their claim" and that the motion for judgment as a matter of law was prop-

erly denied. *Wyatt*, 819 F.2d at 70. Apparently, Dave & Buster's derives the notion that the Callwoods and the Gilberts are required at this stage to present "substantial evidence" in support of their claims from the Fourth Circuit's reference to "substantial evidence" and its subsequent analysis. This view of the burden of production required of nonmovant-plaintiffs at the summary judgment stage is potentially misleading.

It is well settled that the standard for granting summary judgment under Rule 56 "mirrors" the standard for a judgment as a matter of law under Rule 50. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. At the summary judgment stage, an issue supported by evidence produced by the nonmovant plaintiff "such that a reasonable jury could return a verdict" in its favor is deemed to be "genuine." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The conclusion that an issue is genuine (and material) warrants the denial of a defendant's motion for summary judgment under Rule 56. *See id.* at 250–51, 106 S.Ct. 2505; Fed.R.Civ.P. 56.

Similarly, a jury verdict which is supported by evidence of "such quality and weight that reasonable and fair minded [persons] in the exercise of impartial judgment could reasonably" accept, *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1350 (4th Cir.1995) (quoting *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir.1980) (defining "substantial evidence" for purposes of Rule 56)), is deemed to be supported by "substantial evidence." Just as the conclusion that an issue is "genuine" warrants the denial of a motion for summary judgment, the conclusion that a verdict relating to an issue is supported by "substantial evidence" warrants the denial of a defendant's motion for judgment as a matter of law.

As the Supreme Court explained, the primary difference between Rule 56 and 50 is procedural. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. It explained further,

though, that "[i]n essence ... the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

Thus, it may be a fair statement to say that an issue is "genuine" for purposes of summary judgment under Rule 56 when it is supported by the same quantum of evidence that would support a conclusion, in ruling on a motion for judgment as a matter of law under Rule 50, that a verdict on an issue is supported by "substantial evidence." However, to the extent that the use of the term "substantial evidence" to characterize a nonmovant-plaintiff's burden at the summary judgment stage suggests a *greater* burden for nonmovant-plaintiffs than is otherwise required by Rule 56, that suggestion misstates the actual standard for this stage of the proceedings: that in order to survive a motion for summary judgment the nonmovant-plaintiff must produce evidence sufficient to demonstrate the existence of a *genuine* issue of material fact for trial, that is, must demonstrate a disagreement about a material fact supported by evidence "such that a reasonable jury could return a verdict" in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. I will proceed with this understanding.

## III. FACTS

As might be imagined, there are considerable factual disputes between the plaintiffs, respectively, and the employees of the defendant as to the nature of, and the underlying motivations for, the interactions which occurred during the plaintiffs' visits. Moreover, the parties disagree strongly over which of those factual disputes are material to the case. I shall provide here a summary of the facts in the light most favorable to the plaintiffs. Additional facts shall be described in the analysis of the plaintiffs' claims.

### A. The Callwood Case

The claims of the Callwoods focus primarily upon their unpleasant interactions with Deborah Countryman ("Countryman"), the waitperson assigned to service patrons in the area of the restaurant in which the Callwood party took seats upon their arrival at the restaurant, and her manager, Adam Smith ("Smith"). Ultimately, as described below, the Callwoods were ejected from the restaurant by security personnel at Smith's direction.

Viewing the evidence in the light most favorable to the Callwoods, the relevant facts may be summarized as follows. On Saturday, May 24, 1997, at approximately 6:30 p.m., nine members of the Callwood party arrived at the restaurant to celebrate the graduation from the United States Naval Academy of one of their sons. The adult members of the party included Dr. Hortense Harrison and Dr. Mark Harrison, Sr., professional educators who are residents of Missouri and the parents of the graduate, A. Kathryn Callwood and Gerald Fauntroy, Sr. The minors with them were Horace and Eion Callwood, Courtney and Gerald Fauntroy, and Eric Harrison. Three other members of their party, Mark Harrison, Jr. (the graduate), Chimesa Harrison and Carolina Liljedahl, arrived later in the evening. All but Liljedahl, who is white, are African–American. Eight members of the Callwood party are plaintiffs in this case. *See* n. 1, *supra.*

Upon their arrival, the Callwoods were directed by a member of the restaurant staff to a long table, called the "backgammon table," in one of the bar areas of the restaurant. The Callwoods assert that they were told almost immediately by Countryman after they began to assemble in the area around the backgammon table that they should sit in another area of the restaurant. The Callwoods apparently ignored Countryman's directive and took seats at the backgammon table anyway. After seating themselves and leaving beverage requests with Dr. Hortense Harrison (to be relayed to their server,

Countryman), the majority of the party proceeded to the arcade area with the children. Members of the group returned to the table at least once to leave additional drink orders with Dr. Harrison.

There existed at the time of the events in this case, apparently, a rather poorly defined (Countryman herself admitted on deposition that she had sought "clarification" of the policy from Smith) and unwritten seating policy. The restaurant took no reservations. The extant seating policy provided that patrons in the facility awaiting the arrival of others could not "save" seats for members of their party expected to arrive later. However, once a party was "complete," i.e., once all members of the party had arrived at the restaurant, individuals could go to other areas of the restaurant, e.g., the arcade area, called the Midway, and one member of the party could remain at the table to prevent newly-arriving patrons from claiming erstwhile "vacant" seats.

Viewed in the light most favorable to the Callwoods, whose version of their interactions with Countryman diverges significantly from the version provided by Countryman herself, the reasonable inferences suggest that neither Countryman nor her manager, Smith, had any reason to believe that the Callwoods were not in compliance with the seating policy. In fact, however, as mentioned above, upon the arrival of the first nine members of the Callwood party and for a short period of time thereafter, their group was not "complete" because three others had not arrived. In any event, at the time that the dispute with Countryman over the seating policy, described below, arose, it appears that the Callwood group of nine was "claiming" all of the *open* seats (which numbered, it appears, between seven and nine or ten) at the backgammon table, which seats from 12–14 patrons overall. At about this time, two unrelated groups of patrons, sitting at opposite ends of the backgammon table, were enjoying their meals, and the members of one such group, at least, were apparently finishing up their meals and may have been preparing to depart.

Thus, while Dr. Hortense Harrison remained at the backgammon table, she asserts, she was repeatedly and, apparently in her view, without justification and in a disrespectful tone, warned by Countryman—at least three times—that the Callwoods could not "save" seats unless the party was complete. At one point, Countryman summoned her manager, Smith, to reiterate the warning to Dr. Harrison not to save seats for members of her party. Each time Dr. Harrison received warnings, she informed Countryman (and Smith) that, in compliance with the "no saving seats" policy as it had been explained to her, members of her party were in the restaurant and would be returning to the "saved" seats. Countryman insisted on deposition that at least one party of newly-arriving guests (whom she would have served and thereby earned income in the form of gratuities had they taken seats at the backgammon table) were denied seats at the backgammon table by the actions of Dr. Harrison. Dr. Harrison denies that any patrons sought seating at the backgammon table after the Callwoods arrived and, again, seems to suggest that the seats were not, in any event, otherwise vacant.

Significantly, a party of white patrons sitting at the other end of the backgammon table across from the Callwoods provides substantial contemporaneous evidentiary support for the particular perceptions of Dr. Hortense Harrison and for her account of her interactions with Countryman. The members of this party, consisting of Kimberly Coy, Mary Coy and George Coy (collectively, the "Coys"), eventually confirmed to Dr. Hortense Harrison her evolving view that, in contrast to the service Countryman was providing to the Coys, she (Countryman) was providing an inexplicably disparate level of service to Dr. Harrison and through Dr. Harrison, the members of the Callwood group. Moreover, at one point Kelly Adcock, a bartender working at the nearby bar, no-

ticed the delay in Dr. Harrison's receipt of service from Countryman, and thus he, rather than Countryman, served drinks to Dr. Harrison on at least two occasions. Adcock did not mention any issue regarding the seating policy with Dr. Harrison during these interactions. It appears that Countryman may have served at least one drink and one appetizer, an order of chicken wings, to the Callwoods before she ceased acting as their server, as described below.

At one point, as manager Smith was admonishing Dr. Harrison about the seating policy, George Coy vigorously confronted Smith in the Callwoods' defense. Coy challenged the propriety of Smith's and Countryman's warnings to Dr. Harrison, spoke loudly in doing so and, according to Dr. Harrison, actually used profanity during the exchange. Dave & Buster's has a practice of "frequently eject[ing] guests ... because of fighting, shouting, causing a scene, or threatening or menacing of other guests or staff." Joy Aff. at 3. Nevertheless, neither George Coy nor any member of his party was reprimanded or ejected from the establishment in consequence of George Coy's outburst.

Subsequently, Countryman asserts, A. Kathryn Callwood, upon her return to the backgammon table from the arcade area and upon learning from Dr. Harrison of the on-going "dispute" over the seating policy, made a statement to Countryman which, according to Countryman, she reasonably understood to indicate that the members of the Callwood party no longer wished to have Countryman act as their server and, apparently, would not be placing any orders with her. Countryman communicated this understanding of A. Kathryn Callwood's statement to Smith, and she told Smith that since the Callwoods had been rude to her, she no longer wished to serve them. Smith never investigated the accuracy of Countryman's account. Both Countryman and Smith are white.

In due course, after all the members of the Callwood party had assembled at the backgammon table, Dr. Mark Harrison told Countryman, who was clearing the dishes away from where the Coys' had been seated at one end of the table, that the Callwoods were ready to order food. Countryman stated to Dr. Mark Harrison that she was no longer the Callwoods' server and that she would get another server. After the passage of some time, Dr. Mark Harrison approached another staff member seeking service, who in turn called over manager Smith.

Smith responded to Dr. Mark Harrison's request for a server by telling Dr. Harrison that the Callwoods, in effect, likely would not be served because he, Smith, was having difficulty finding an available waitperson from any area of the restaurant. Smith added, moreover, that the Callwoods would not be in such a difficult position if they had not been rude to Countryman. Upon hearing Smith declare that the group would not be served, Chimesa Harrison exclaimed, "[t]hat's it, I'm outta here," slammed her hands to the table, and thereby caused chicken bones from an appetizer to scatter on the table. The Callwoods contend that the scattering of the bones was an obvious accidental spill, whereas Smith reacted immediately and alleged that Chimesa Harrison was "throwing food" at him. He directed Chimesa Harrison to leave the restaurant. (Smith also testified on deposition that Chimesa Harrison punctuated her act by using a common four-letter expletive.) When members of the Callwood party protested Smith's decision to eject Chimesa Harrison and demanded an explanation for it, Smith radioed for assistance and had the entire Callwood party escorted out of the restaurant by security personnel, including off-duty county police officers. Smith asserts that the party had become loud and disruptive.

B.   The Gilbert Case

The Gilberts were not ejected from the restaurant but they contend that their vol-

untary departure amounted to a "constructive eviction." Specifically, their claims arise from a series of negative interactions with restaurant staff during their visit.

Viewing the evidence in the light most favorable to the Gilberts, the relevant facts may be summarized as follows. On April 20, 1997, at approximately 4:00 p.m., nine members of the Gilbert party arrived at the restaurant. The members present were Lisa Gilbert, George Gilbert, Jr., Tiajuana James, Tanisha James, Andre Andrews, Mekisha Nash, Michelle Walters, Chanda Hutcherson and Tamara Golphin.

Apparently, although the record is somewhat unclear on the point, defendant checks the ages of adult guests upon their entry. When the first nine members of the Gilbert party arrived, eight members of the group presented satisfactory identification and were allowed to enter. One member of the group, Andre Andrews, who at age 31 was the oldest person in the group, presented a form of work identification which did not show his age; he was told to step aside while other guests were checked. While she waited with Andrews, Tiajauna James stated to the door attendant that the attendant had allowed a white couple and a man of Asian descent enter without proper identification while detaining Andrews. Thereupon, the attendant directed Andrews to enter without further examination.

The Gilberts were shown by the hostess, who was African–American, to two round tables in the dining room. The Gilberts allege the tables were "near the kitchen." They asked the hostess, and later the waiter, about the availability of a large unoccupied table in the balcony. The Gilberts were informed that the table was unavailable, but they could push the two round tables together; they did so. Sometime after being seated, the Gilberts noticed a large party of white patrons take seats at the balcony table the Gilberts had been told was unavailable.

The Gilbert party enjoyed their meal without significant complaints. Thereafter, based on information that, during an earlier visit, a relative had received complimentary computer cards for use in the games and entertainments available in the arcade, a member of the party asked a staff person for complimentary cards. The staffer directed the group to Tim Welsh, a manager. When they spoke to Welsh to ask about complimentary cards, he was curt and rude and, after he had spoken angrily to the staffer, declined to give away any complimentary cards. As it turns out, complimentary cards are not available simply for the asking, as apparently the staffer had believed, but are provided only on weekdays during lunch, or as a goodwill gesture when there had been a problem with service. The staffer apologized for the misunderstanding he had fostered. Eventually, as described below, at least one member of the Gilbert party received complimentary cards after an ugly confrontation between members of the Gilbert group and several white patrons.

At one point, George Gilbert stopped at the front desk to watch the telecast of a basketball game. There were two employees at the front desk watching the game with their backs to approaching customers. Observing this, Welsh approached George Gilbert and spoke to him briefly to determine whether he needed assistance. Welsh then questioned one of the employees and then turned the television away from the basketball game. When George Gilbert reacted incredulously, Welsh responded, according to Gilbert in a sarcastic manner, "Oh, were you watching that?" The game was available for viewing by patrons on many other large screen video monitors throughout the restaurant.

An argument erupted in the arcade area between Tiajuana James and two white patrons over whether two adjacent amusements were operating properly. Apparently, James's machine was operating so as to prevent her from "winning," while the other machine was providing constant

"winners" to the white patrons. The dispute arose when James pointed out the difference to one of the technicians. The white patrons reacted angrily to the fact that James had revealed to defendant's employees their good fortune in operating what was apparently a "broken" machine. A staffer, Rolando Rodriguez, radioed for assistance as the dispute between the respective groups of patrons grew more heated.

Manager Welsh and a number of security persons arrived and surrounded the area, focusing particularly on the members of the Gilbert group. Welsh pointed to Lisa Gilbert, who was sitting nearby, and stated: "If I have any more trouble out of you people, then you people will be put out." Tiajuana James responded that Lisa Gilbert had nothing to do with the matter; it was she who reported the malfunctioning machines. Welsh told Tiajuana James to "shut up and mind her own business," prompting derisive laughter from the other staffers and the white patrons who were participants in the dispute. During the encounter, someone referred to "[t]hose Black Motherf* * *ers." Members of the Gilbert group attest that it was a staffer who made the statement; defendant suggests that it was one of the white patrons involved in the dispute with Tiajuana James who made the remark.

Welsh stated again that if he encountered any more trouble with "you people" he would have them ejected. Tiajuana James accused Welsh of focusing only on the Gilberts, rather than the other (white) patrons who were part of the dispute. Welsh responded that he was talking to "everyone" and he instructed both groups not to talk to or have contact with each other or they would be ejected from the establishment. Eventually, the group of white patrons was ejected, although the Gilberts were not made aware of their ejectment.

When tensions eased, while several of the Gilberts were still in the area, staffer Rodriguez apologized for the employees' behavior towards the Gilberts. Welsh also apologized, and provided complimentary cards to Tiajuana James. Nevertheless, when Welsh departed the area, a number of security personnel remained in the arcade to keep an eye on the disputing patrons. The Gilberts had the distinct impression that they, in particular, were being watched.

Sometime later, while he was watching one member of the Gilbert group play an arcade game from an adjacent stool, George Gilbert asserts, he was taken by the arm and removed from the stool. He was told that if he was not playing the game he was in front of, he would have to move. The stool was also removed.

Having had enough of what they perceived to be discriminatory treatment, the Gilberts decided to depart the restaurant. Welsh approached Michelle Walters as she was making her way to the exit, placed his arm around her shoulder, and asked if she had enjoyed the experience. Walters stated that she had not and that, in her opinion, Dave & Buster's did not know how to treat its customers. This exchange prompted the Gilberts to conclude that Dave & Buster's wished to make sure their party left the facility. They seem also to rely on the fact that, while Tiajuana James was withdrawing money from an automated teller machine in the front lobby of the establishment, she noticed Welsh watching her intently.

Prior to departing, Lisa Gilbert requested the name of Dave & Buster's' president or owner. The employees initially did not respond. When Lisa Gilbert asked again, the first employee behind the desk responded that she did not know this information. The second employee, when she received the request, immediately produced the information, with a phone number. The Gilberts departed.

## IV. THE APPLICABLE CIVIL RIGHTS STATUTES

### A. 42 U.S.C. § 1981

Protection against racial discrimination in the making and enforcement of private

contracts is provided by 42 U.S.C. § 1981.[5] In response to the Supreme Court's holding in *Patterson v. McLean Credit Union,* 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), that section 1981's protection "did not extend to conduct occurring after the contractual relationship had been established, including breach of the terms of the contract," *Evans v. Holiday Inns, Inc.,* 951 F.Supp. 85, 88 (D.Md.1997)(citing *Patterson*) (internal quotations omitted), Congress amended section 1981 to expand its reach to the "performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Civil Rights Act of 1991, Pub.L. No. 102–166, § 101 (codified as 42 U.S.C. § 1981(b)); *see also Bobbitt v. Rage, Inc.,* 19 F.Supp.2d 512, 516 (W.D.N.C.1998) (citing *Beardsley v. Webb,* 30 F.3d 524, 527 (4th Cir.1994)); *Evans,* 951 F.Supp. at 88.

The legislative history of the Civil Rights Act of 1991 reveals that in amending section 1981 Congress reaffirmed the view that section 1981 is "a critically important tool used to strike down racially discriminatory practices in a broad variety of contexts." H. Rep. No. 102–40, pt. II, at 36 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 729 (Report of House Judiciary Committee on Civil Rights Act of 1991). Pursuant to its expansive view of section 1981, Congress intended the amended language in section 1981—in particular, the use of the phrase "benefits, privileges, terms and conditions"—to be an "illustrative rather than exhaustive" list of the protected facets of the contractual relationship. *See* H. Rep. No. 102–40, pt. I, at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 630 (Report of House Education and Labor Committee on Civil Rights Act of 1991); H. Rep. No. 102–40, pt. II, at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 730–31 (Report of

House Judiciary Committee on Civil Rights Act of 1991).

The illustrative language was "intend[ed] ... to bar all race discrimination in contractual relations." H. Rep. No. 102–40, pt. I, at 92; H. Rep. No. 102–40, pt. II, at 37; *cf. Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)(citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)(finding that the use, in section 703 of Title VII of the Civil Rights Act of 1964, of the phrase "benefits, privileges, terms and conditions of the contractual relationship" "evinces a congressional intent to strike at the entire spectrum of disparate treatment")).

■ Accordingly, as amended, section 1981 provides protection against discriminatory conduct occurring during and after the formation of a contract. Courts have increasing experience in applying section 1981 in a restaurant setting. *See, e.g., Laroche v. Denny's, Inc.,* 62 F.Supp.2d 1375 (S.D.Fla.1999); *Wells v. Burger King Corp.,* 40 F.Supp.2d 1366 (N.D.Fla.1998); *McCaleb v. Pizza Hut of America, Inc.,* 28 F.Supp.2d 1043 (N.D.Ill.1998); *Bobbitt,* 19 F.Supp.2d at 519; *White v. Denny's,* 918 F.Supp. 1418 (D.Colo.1996).

"The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate in the marketplace." *Bobbitt,* 19 F.Supp.2d at 516 (citing *Patterson,* 491 U.S. at 190, 109 S.Ct. 2363). In the restaurant context, section 1981 has been read to protect against the discriminatory denial of "the accouterments that are ordinarily provided with a restaurant meal...." *McCaleb,* 28 F.Supp.2d at 1048. Put another way, "the contract formed between a restaurant and a customer does include more than just the food served," in that the experience "includes being served in an atmosphere which a reasonable person would expect in the chosen place." *Charity v. Denny's,*

5. Prior to its 1991 amendment, the statute provided in relevant part: "All persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981.

*Inc.*, 1999 WL 544687, at *3 (E.D.La., July 26, 1999)(citing, *inter alia, McCaleb,* 28 F.Supp.2d at 1048).

The Fourth Circuit, like most courts, has long held that, in the employment context, the elements of a claim under section 1981 are largely the same as those for a claim of race discrimination under Title VII of the Civil Rights Act of 1964, *see Gairola v. Commonwealth of Virginia Department of General Services,* 753 F.2d 1281, 1285 (4th Cir.1985); *Abasiekong v. City of Shelby,* 744 F.2d 1055, 1058 (4th Cir.1984). Indeed, the Court has indicated that the well-known burden-shifting scheme established for Title VII claims by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), is generally appropriate whenever a claim requiring proof of intentional discrimination is based, as in the cases at bar, on indirect or circumstantial evidence. *See Mullen v. Princess Anne Volunteer Fire Co.,* 853 F.2d 1130, 1136 (4th Cir.1988). *See also Evans,* 951 F.Supp. at 89 (citing *Cook v. CSX Trans. Corp.,* 988 F.2d 507, 511 (4th Cir.1993)).

■ Beyond these general observations, it is important to recall that the *McDonnell Douglas* proof scheme is intended to provide flexibility so that it is adaptable to the needs of the myriad of cases in which it is to be applied. *See Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 611 (4th Cir.1999)("We note, however, that although helpful, the *McDonnell Douglas* framework should not be applied in a 'rigid, mechanized, or ritualistic' manner.")(citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). Thus, as I observed in *Evans,* 951 F.Supp. at 89, there are several "models" of the so-called "prima facie case" and further, a test for a prima facie case which strikes at too high a level of "generality" may lack utility. *Id.*

In *Evans,* I determined that in order to make out a prima facie case where plaintiffs alleged they were subjected to the discriminatory enforcement of behavior standards leading to the imposition of the "ultimate sanction" of eviction from a motel for disturbing other guests, the plaintiffs must show as the elements of their prima facie case that: (1) they were members of a protected class; (2) they engaged in conduct that was comparable in its noxiousness to that engaged in by guests outside the protected class; and (3) they were subjected to the ultimate sanction—expulsion from the establishment—whereas others outside the protected class received a lesser sanction or were afforded accommodating treatment, i.e., were not ejected from the establishment. *See Evans,* 951 F.Supp. at 89 (citing *Hornick v. Noyes,* 708 F.2d 321, 325 n. 8 (7th Cir.1983)). Under the circumstances of *Evans,* I concluded that an analogy to workplace discipline was appropriate in that particular public accommodations context.

Defendant would have me apply the elements of a prima facie case that I found applicable in *Evans* to the circumstances surrounding the Callwood case. I decline to do so, however, because, at bottom, neither of the cases at bar (as indeed the defendant expressly recognizes as to the Gilbert case) is usefully analogized to "discipline" cases. Rather, the cases before me arise directly under subsection (b) of section 1981: plaintiffs complain that they were deprived of "the enjoyment of all benefits, privileges, terms and conditions" expected to be enjoyed and actually enjoyed by one not in the protected class who presented himself or herself at the restaurant.

In this regard, although the Callwood plaintiffs properly alleged in their joint complaint a single count and claim to relief pursuant to section 1981, they have purported to assert (and defendant has undertaken to address in its memorandum in support of the motion for summary judgment) three distinct clusters of facts as

constituting discrete cognizable claims under section 1981: "slower, less courteous service;" "den[ial of] service;" and "eject[ment]." Despite the parties' apparent agreement on this mode of analysis, I reject their suggestion that these factual groupings constitute discrete cognizable claims. Rather, plaintiffs' section 1981 claim is appropriately analyzed as a singular, unified claim of disparate treatment in the enjoyment of all "benefits and privileges" of the Dave and Buster's experience on the same "terms and conditions" as are generally available to white persons.[6]

In formulating the elements of a prima facie case for the instant cases, I have considered several factors. First, I have considered the varied tests for a prima facie case that courts have applied in the context of 1981 claims asserted against restauranteurs and their agents. In *Bobbitt*, 19 F.Supp.2d at 519, the court stated the elements of the prima facie case as follows: "To establish a section 1981 claim, the plaintiff must show that (1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute; in this case, the making and enforcing of a contract."[7] In my view, however, this formulation erroneously collapses the overall elements of a section 1981 *claim* with the elements of a *prima facie case.* In particular, to the extent that any formulation of

the elements of a prima facie case includes a requirement that the plaintiff show that the defendant had an intent to discriminate on the basis of race, such a formulation is inappropriate because the very point of the prima facie case requirement is to provide a basis for *inferring* the existence of a discriminatory motive.

Nevertheless, Dave & Buster's contends that I should apply the above test to the Gilberts' claims, citing *Morris v. Office Max*, 89 F.3d 411 (7th Cir.1996), certainly one of the leading authorities in the context of section 1981 claims against retail merchants. In *Morris*, however, the court nowhere mentions the term "prima facie case." It is plain that the court is describing the elements of a section 1981 *claim*, not the elements of a *prima facie case.* See also *Edwards & Associates, Inc. v. Black & Veatch, L.L.P.*, 84 F.Supp.2d 1182, 1191–92 & n. 17 (D.Kan.2000)(accepting the following elements of prima facie case under section 1981: "(1) that plaintiffs are members of a protected class; (2) that they attempted to contract for certain services; (3) that they were denied the right to contract for those services; and (4) that such services remained available to others outside the protected class.").

Second, I have borne in mind that the prima facie case requirement is essentially a "channeling device" which "is not a difficult requirement to satisfy," see *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 181 (4th

---

6. Similarly, the Gilberts have alleged their claims in a two-count complaint, one count for each of the distinct statutory bases for their claims. As is true of the Callwood case, I do not deem the evidentiary groupings of facts around events during their April 20, 1997, visit to constitute separately cognizable claims.

7. In contrast, the *Laroche* court formulated the elements of the prima facie case as follows: "[T]he Plaintiffs must prove that: (1) they are members of a protected class; (2) they attempted to contract for services and to afford themselves the full benefits and enjoyment of a public accommodation; (3) they were denied the right to contract for those

services and, thus, were denied the full benefits or enjoyment of a public accommodation; and (4) such services were available to similarly situated persons outside the protected class who received full benefits or enjoyment, or were treated better." 62 F.Supp.2d at 1382.

In *Wells*, the court stated: "Plaintiffs have the initial burden of demonstrating that: (1) they are members of a protected class; (2) they attempted to contract for certain services; (3) they were denied the right to contract for those services; and (4) such services remained available to similarly situated persons outside the protected class." 40 F.Supp.2d at 1368.

Cir.1998)(Title VII employment discrimination case). And finally, I have attempted to take account of the largely itinerant nature of the clientele of the retail food service enterprises, and thus the fact that, if the requirement that some comparison be made between plaintiffs and "similarly situated persons outside the protected group" is applied with a stringency that is unrealistic, then few *bona fide* victims of discrimination would ever be able to succeed on a section 1981 claim arising in a restaurant setting or similar place of public accommodation. *Cf. Arguello v. Conoco, Inc.,* 207 F.3d 803, 809–10 (5th Cir.2000)(distinguishing employment and public accommodations discrimination cases and concluding that "a rule that only actions by supervisors are imputed to the employer would result [in the public accommodations context], in most cases, in a no liability rule.").

This latter point is important in view of the significant differences between claims arising in the employment context as compared to those arising in the public accommodations context. Employment decisions, by and large, are regularized and periodic, are made by supervisory personnel, and by their very nature are almost always documented, and thus preserved for sober examination. Consequently, employment decisions leave behind a paper trail of evidence which to a greater or lesser extent will be available during discovery or otherwise to a discrimination victim. It makes sense, therefore, to insist upon evidence of comparators—similarly situated applicants or employees not in the same protected class—in assessing the strength of the inference of a discriminatory motive which is essential to proof of the claim.

In the restaurant context, in contrast, the interactions of a highly mobile public with hostesses, waitpersons and managers are necessarily ad hoc and transient, are almost never with higher-ranking personnel of the enterprise, and are almost never documented in any meaningful sense. Given the ephemeral nature of interpersonal interactions in the public accommodations context, therefore, it may be wholly unrealistic to require a member of the protected class who suffers through what she perceives to be a shockingly discourteous and hostile experience, to identify victims of such outlandishly horrendous service who are not members of the protected class before the federally-guaranteed rights embodied in section 1981 may be vindicated. *See Stevens v. Steak n Shake, Inc.,* 35 F.Supp.2d 882 (M.D.Fla.1998)("Of course, evidence of how the defendant treated others outside the protected group is not always available."); *Hampton v. Dillard Dept. Stores, Inc.,* 985 F.Supp. 1055 (D.Kan.1997)("[E]vidence regarding the treatment of others outside the protected group is not present in every case of discrimination. Where similarly situated non-protected individuals are present, however, disparate treatment may give rise to an inference of discrimination.... Moreover, the elements of a prima facie case are flexible and are not intended to be rigidly applied.").

To be sure, courts have properly commented upon the fact that *all* persons have unpleasant experiences in restaurants and other places of public accommodation. *See, e.g., Bobbitt,* 19 F.Supp.2d at 519 ("While [rude and/or bad service] is regrettable and frustrating, it is a phenomenon familiar to all who eat at restaurants."); *Robertson v. Burger King, Inc.,* 848 F.Supp. 78, 81 (E.D.La.1994) ("While inconvenient and frustrating, and all too common, the mere fact of slow service in a fast food restaurant does not, in the eyes of this Court, rise to the level of violating one's civil rights."). Certainly, the trivialities and frustrations of life in post-modern America must not be made the fodder for federal civil rights claims simply because service is slow or otherwise lacking in those attributes paying customers always have a right to expect. *See White,* 918 F.Supp. at 1423 (plaintiff must do more than simply invoke his race in the course

of a claim's narrative); *Hawkins v. Pepsi-Co, Inc.,* 203 F.3d 274, 282 (4th Cir. 2000)("Law does not blindly ascribe to race all personal conflicts between individuals of different races.").

A proper prima facie showing should include elements that strike an appropriate balance between these competing considerations. The days of "the customer is always right" are long past, assuming they ever existed at all. Nonetheless, latent and patent bigotry have not become such strangers in the public and private spheres of activity in our culture so as to justify a court's erection of impenetrable barriers to the attempts by members of racial and ethnic minorities to vindicate the interests in personal dignity section 1981 is manifestly intended to protect.

Accordingly, I conclude that in order to make out a prima facie case under the circumstances of these cases, plaintiffs must show the following: (1) they are members of a protected class; (2) they made themselves available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable. *Cf. Edwards & Associates, Inc.,* 84 F.Supp.2d at 1191–92.

The first and second elements are consistent with standard formulations of the prima facie case in the better-reasoned cases. *See id.* Likewise, subpart 3(a) of the above test invokes traditional "similarly situated" analysis, and recognizes that the point of comparisons between plaintiffs within the protected class and similarly situated persons outside the class "is this:

because the classes are similarly situated in most relevant respects except their protected status (e.g., gender or race), there arises a rational inference of discrimination on the basis of that status." *Myers v. Hose,* 50 F.3d 278, 284 (4th Cir.1995)(employment discrimination under Americans With Disabilities Act). The formulation must be qualified by the Fourth Circuit's "understanding" of the "reality that the comparison will never involve precisely the same set of ... [conduct] occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993) (citing *Moore v. City of Charlotte,* 754 F.2d 1100, 1107–11 (4th Cir.1985)). This understanding is particularly resonant in the public accommodations context, given the extraordinarily transient nature of the interpersonal contacts between patrons and service employees.

Subpart (3)(a) of the above formulation also recognizes that limiting the right of recovery under section 1981 to instances where there was an outright *denial* of services or of the right to contract for services, *see, e.g., Edwards,* 84 F.Supp.2d at 1191–92 (stating the third element of the prima facie case as the denial of the right to contract for services); *Laroche,* 62 F.Supp.2d at 1382 (same); *White,* 918 F.Supp. at 1424 (same), not only is impractical given contemporary manifestations of discrimination, but also unnecessarily creates the risk that courts will restrict the scope of the remedy envisioned by Congress' 1991 amendment of section 1981. By encompassing the *deprivation* of services (rather than simply the denial of services or the right to contract for those services), subpart (3)(a) protects against discriminatory conduct by retailers which, while not necessarily constituting a denial of services, nevertheless impinges on the "benefits, privileges, terms, and conditions of the contractual relationship" protected by section 1981(b). *See* H. Rep. No. 102–40, pt. I, at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 630 (stating that the list of

terms "is illustrative rather than exhaustive," "intend[ed] ... to bar all race discrimination in contractual relations."); H. Rep. No. 102–40, pt. II, at 37, *reprinted in* 1991 U.S.C.C.A.N. at 730–31 (same); *cf. Harris,* 510 U.S. at 20, 114 S.Ct. 367 (citing *Meritor Savings Bank,* 477 U.S. at 64, 106 S.Ct. 2399 (finding that the use of the same phrase in Title VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment")).

As noted above, often in the retail context, evidence of the retailer's conduct towards similarly situated patrons outside the protected class is difficult, if not impossible, to discover. Accordingly, subpart (3)(b) recognizes that even in the absence of similarly situated comparators outside the protected class, "markedly hostile" behavior towards members of the protected class may, under the circumstances of a particular case, give rise to a rational inference of discrimination sufficient to support a prima facie case. Factors relevant to the determination of whether conduct is "markedly hostile" are whether the conduct of a merchant or her agents is (1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination.

Thus, subpart (3)(b) eschews the requirement of serendipity inherent in a crabbed application of a "similarly situated" analysis by considering normative factors which are commonly understood to influence the conduct of merchants and their agents in a profit-motivated enterprise to render agreeable service to paying customers. Evidence of a merchant's or her agent's gross deviation from business norms and financial considerations in conduct towards members of the protected class offers sufficient alternative circum-

stantial indicia of discriminatory intent to satisfy the function of the prima facie case. To the extent that evidence of similarity between protected and non-protected members is accessible, this evidence, while *not required,* retains utility under subpart (3)(b) by exposing arbitrary behaviors towards members of the protected class, thereby supporting the conclusion that the conduct of a particular public accommodations operator or her agent is "markedly hostile."

If the plaintiffs successfully establish the elements of their prima facie case as described above, then the burden of production rests upon defendant to produce evidence of one or more legitimate non-discriminatory reasons for the adverse treatment accorded to plaintiffs. The Callwoods and Gilberts must then produce sufficient evidence to establish the existence of a genuine issue of material fact that Dave & Buster's' proffered reasons are merely pretexts for intentional discrimination. *See Evans,* 951 F.Supp. at 89 (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). A pretext exists only if the Callwoods and the Gilberts show both that Dave & Buster's' proffered reason for disparate treatment is false and that racially motivated discrimination was the actual reason for the disparate or markedly hostile treatment. *See Evans,* 951 F.Supp. at 89 (citing *Jiminez v. Mary Washington College,* 57 F.3d 369, 378 (4th Cir.) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993))).

### B. 42 U.S.C. § 2000a

■ Section 2000a, Title II of the Civil Rights Act, creates a private cause of action to remedy discrimination in public accommodations affecting interstate commerce.[8] Only injunctive and declaratory

---

8. Title II of the Civil Rights Act provides in pertinent part: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public ac-

commodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or natural origin." 42 U.S.C.A. § 2000a(a). The section further provides that any restaurant "is a

relief in addition to attorneys fees may be awarded to a prevailing plaintiff. *See Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).[9] To prevail, if the defendant is a restaurateur, the plaintiff must establish that (1) the restaurant affects commerce; (2) the restaurant is a public accommodation; and (3) the restaurateur denied plaintiff full and equal enjoyment of the establishment. *See* 42 U.S.C. § 2000a; *Wooten v. Moore*, 400 F.2d 239, 241 (4th Cir.), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *United States v. DeRosier*, 473 F.2d 749 (5th Cir.1973). As under section 1981, the third element of a Title II claim—the denial of "full and equal enjoyment" of the establishment for reasons based on race—is analyzed using the well-settled *McDonnell Douglas* evidentiary scheme. *See Evans*, 951 F.Supp. at 88.

## V. ANALYSIS

Application of the above principles to the cases at bar yields a clear result in each of these cases. The Callwoods' claims survive summary judgment and the Gilberts' claims do not. I explain.

### A. The Callwood Case

After a searching review of the memoranda, affidavits and depositions on file, I conclude that the Callwoods have produced sufficient evidence to establish a prima facie case under section 1981. Moreover, I am persuaded that genuine issues of material fact exist as to whether the reasons given by Dave & Buster's to explain the

adverse treatment to which the Callwoods were subjected are pretextual and whether the real reason for that disparate treatment was unlawful racial discrimination. *See Hicks*, 509 U.S. at 523–24, 113 S.Ct. 2742; *Jiminez*, 57 F.3d at 378.

1. The Callwoods have established a prima facie case of intentional discrimination on the basis of race

■ It is beyond doubt that the Callwoods have succeeded in establishing the first and second elements of the prima facie case; as African–Americans, they are members of a protected class and they made themselves available to receive and pay for services ordinarily provided by Dave & Buster's to all members of the public. My analysis, therefore, will focus primarily on the third element of the prima facie case to determine if the Callwoods "did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a markedly hostile manner, and in a manner which a reasonable person would find objectively unreasonable."

The Callwoods have successfully established the third element of the prima facie case, in part, by pointing to factual circumstances which rationally support an inference of unlawful discrimination because they have produced sufficient evidence demonstrating that they were deprived of

place of public accommodation within the meaning of this subchapter if its operations affect commerce...." *Id.* at § 2000a(b). A restaurant "affects commerce" if "it serves or offers to serve interstate travelers or a substantial portion of the food which it serves ... has moved in commerce...." *Id.* at § 2000a(c). "Commerce" is defined as, but is not limited to "travel, trade, traffic, commerce, transportation, or communication among the several states...." *Id.; Bobbitt*, 19 F.Supp.2d at 521 (citing *Katzenbach v. McClung*, 379 U.S. 294, 299–301, 85 S.Ct.

377, 13 L.Ed.2d 290 (1964), and *Wooten v. Moore*, 400 F.2d 239, 241–42 (4th Cir.), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)).

9. It should be noted that there is not a scintilla of evidence in the record that defendant had a *policy* of discrimination. Thus, while the Callwoods' Title II claim will remain in the case, it is not expected that, if the claim goes to trial, any award of injunctive or declaratory relief will be justified.

services while members outside the protected class were not deprived of those services.

Evidence regarding the conduct of Countryman, examined in the light most favorable to the Callwoods, establishes that from her very first encounter with the Callwoods, Countryman deprived the Callwoods of a level of service that was provided to members outside the protected class. This deprivation of services is established, in part, through the deposition testimony of each of Dr. Hortense Harrison, Kimberly Coy and George Coy.

After observing Countryman travel the length of the backgammon table and ignore Dr. Hortense Harrison's attempts to attract Countryman's attention, George Coy commented to Dr. Harrison on Countryman's rude and discourteous behavior towards the Callwoods. *See* Deposition of Hortense Harrison at 91. George Coy noted the disparate quality of service Dr. Harrison received and remarked that members of his party "were getting fine service. [The Callwoods'] service was poor to non-existent." Deposition of George Coy at 31. Based on his observation that Dr. Hortense Harrison was seated at the same table as he was and shared the same waitperson, Countryman, George Coy stated that he "had no other conclusion but to believe that their poor service was being received because of their race . . . ." *Id.* at 31–32. Similarly, Kimberly Coy remarked that the Callwoods "weren't being given the same service that [the Coys] were, and [the Callwoods] were sitting at the same table we were. And there were no other differences but [race]." Deposition of Kimberly Coy at 41.

Comparisons between similarly situated members within and outside the class support an inference of discrimination. *See Myers,* 50 F.3d at 284; *Moore,* 754 F.2d at 1107–11. The First Circuit has observed that the determination of whether parties are similarly situated is based on "whether a prudent person, looking objectively at the incidents, would think [the incidents]

roughly equivalent and the protagonists similarly situated . . . ." *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989). The relevant aspects of the comparison are those "factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Id.* (internal quotations and citations omitted).

Based on the considerations in *Cook, Moore* and *Dartmouth Review,* I am satisfied that the Coys were similarly situated to the Callwoods in "most relevant respects," *see Myers,* 50 F.3d at 284; *Moore,* 754 F.2d at 1107–11, and that a "reasoned analogy" can be made between the two parties, *see Dartmouth Review,* 889 F.2d at 19. Each party was seated at the same table and each party was the responsibility of the same waitperson. Under these circumstances, a "prudent person, looking objectively" at the facts could reasonably conclude that they are "fair congeners." *Dartmouth Review,* 889 F.2d at 19. Accordingly, the Callwoods have successfully pointed to facts which rationally support an inference of unlawful discrimination by demonstrating that while they were deprived of services ordinarily provided by Dave & Buster's to members of the public, persons outside of the protected class were not deprived of those services, though substantially similarly situated.

In addition, the Callwoods have successfully established the third element of the prima facie case, in part, by pointing to factual circumstances which rationally support an inference of unlawful discrimination because they have produced evidence demonstrating that they received limited services and then defendant wholly denied them services (by ejecting them) in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

According to Dr. Hortense Harrison, she was repeatedly warned by Countryman about "saving" seats in a manner and under circumstances which a reasonable person would find objectively unreasonable. Countryman's warnings about saving seats, when examined in the light most favorable to the Callwoods, establishes that, according to Countryman's iteration of the seating policy, "[o]nce it is established that the full party is there, [members of the party] are free to go to the [arcade] area to play games, but someone must remain at the table." Deposition of Deborah Countryman at 68. When evaluated in light of Countryman's stated understanding of the seating policy, a reasonable person could conclude that the facts indicate that the Callwoods had indeed satisfied the conditions of the seating policy: nine members of the group (which Countryman had no reason to believe was incomplete) arrived at the restaurant, occupied seats, left drink orders or returned to leave additional drink orders for Dr. Hortense Harrison to place, and assured that one person, Dr. Hortense Harrison, remained at the table at all times. Rather than simply take the orders of these patrons, Countryman and Smith, collectively, warned Dr. Hortense Harrison about saving seats at least three times within an hour. And, these warnings followed Countryman's pointed direction to the Callwoods to sit elsewhere in the restaurant.

Considering the factors set forth above, Countryman's behavior may be characterized as markedly hostile. Moreover, even assuming Countryman knew the Callwood party was "incomplete" (i.e., she knew that the nine members of the Callwood party who were present were expecting three additional guests), Countryman's repeated and disruptive warnings about an "incomplete" twelve member party—when nine of members were clearly present, ordering drinks and providing Countryman with an opportunity to earn income from an eventual gratuity—would strike the reasonable person as being so contrary to the manifest financial interests of the retailer (and Countryman herself) as rationally to support an inference of intentional discrimination on the part of Countryman.

The deposition of Dave & Buster's' Director of Human Resources, Mary Reynolds, supports this conclusion. Reynolds explained that the unwritten seating policy cited by Countryman against the Callwoods in the bar area was for "incomplete" parties, used "primarily in the dining room" and not in the bar area. See Deposition of Mary Reynolds at 68. When this evidence is considered in light of indications, from most accounts, that the bar area was not busy during the period Countryman issued repeated warnings, the inference arises that Countryman's behavior was contrary to the financial interests of herself and her employer.[10]

Finally, Countryman's behavior in issuing repeated warnings may be characterized as strikingly arbitrary. Both the Coy and the Callwood parties were seated at the same table and were the responsibility of the same waitperson, Countryman. Both parties were ordering drinks—the Coys from Countryman; the Callwoods from Adcock, the bartender—thereby providing income for Dave & Buster's. And, like members of the Callwood party, members of the Coy party departed from and returned to the bar area during their stay.[11] Despite the fact that the Coys and

---

**10.** See, e.g., Deposition of George Coy at 29–30 (stating that when Smith approached "the restaurant was not filled. There was additional seating available up in the bar area not to mention the dining area. So there was not a crowded situation."); Deposition of Adam Smith at 66 (stating that when he approached the table the first time "[i]t was still early in the evening. We really weren't at a full capacity yet."); id. at 69 ("We weren't in a capacity. Nobody was coming up and asking to use the table....").

**11.** Dave & Buster's argues that members of the Coy family were not similarly situated in relation to the Callwoods because the Coys, it argues, only departed the bar area to go to the bathroom and then immediately returned

the Callwoods were similar in "most all relevant respects," *see Myers*, 50 F.3d at 284; *Moore*, 754 F.2d at 1107–11, *Cook*, 988 F.2d at 511; *Dartmouth Review*, 889 F.2d at 19, only the Callwoods received repeated warnings about saving seats from Countryman.[12] On this basis, a reasonable person could conclude that Countryman's manner towards the Callwoods under the circumstances was so arbitrary as to raise the inference of intentional discrimination.

The Callwoods have also successfully established the third element of the prima face case, in part, by pointing to factual circumstances which rationally support an inference of unlawful discrimination because they have produced evidence demonstrating that the circumstances surrounding the ejectment of Chimesa Harrison, and subsequently the entire Callwood party, from the restaurant by Smith was markedly hostile and that the decision to eject the Callwoods was made in a manner and under circumstances which a reasonable person would find objectively unrea-

sonable. The ejectment of the Callwoods, moreover, can be seen as a logical outcome of their earlier interactions with Countryman and Smith and provides substantial support for their claims of racially discriminatory denial of the benefits and privileges of the Dave & Buster's experience.

When Smith approached the Callwoods the second time, he told their twelve-member party (which had already been in the restaurant for over an hour) that they would no longer be served. Smith did not offer to serve the party himself (although he indicated on deposition that he should have done so) or offer further accommodation. The sheer unorthodoxy of such treatment is both contrary to the manifest financial interest of Dave & Buster's and far outside of widely accepted business norms.

Furthermore, when Smith approached the backgammon table, he had absolutely accepted Countryman's word that the Call-

to the table. This contention is contradicted by the testimony of the Coys themselves. *See, e.g.,* Deposition of Mary Coy at 50 ("Q: Were you with your dad and your fiancé and your brother when you—when some members of your group ordered drinks? A: I don't remember. We were sort of like coming and going, playing games and we weren't altogether [sic] all the time. Q: After you played games did you do anything else at Dave & Buster's? A: We went back to the bar area. Q: To the same bar area where you originally ate or to a different area? A: No, the same bar area."). *See also id.* at 34 ("Q: Were you seated in the bar area the whole time that your dad and Kimberly were seated in the bar area? A: I wasn't seated there the whole time my father was. I am not sure about Kim."); Deposition of Dr. Hortense Harrison at 243 ("In group B [the Coy group], the family came and left the table consistently, yet at no time that I was present were they approached by the waitress or the manager and told that they could not reserve seats.").

Smith's testimony supports the conclusion that the Coys did not remain at the backgammon table the entire time of their stay. *See* Deposition of Adam Smith at 57–58 ("Q: What did you observe about [the backgammon] table when you first walked over there? ... A: There were three women sitting triangular across at one corner of the table with a

cake in between them [i.e., the Callwoods], and there were two or three other people at the other end of the table [i.e., two or three out of five Coys present that evening].").

Even if I were to accept Dave & Buster's characterization of the Coys' comings and goings, there is no reason to believe that Countryman—or anyone else associated with Dave & Buster's, for that matter—would have had knowledge of where a particular patron had gone after she left her table. To suggest that Countryman knew that a particular patron had departed a particular table to go to the bathroom or some other "acceptable" location within the restaurant and therefore Countryman did warn the members of her party about saving seats implies a level of omniscience on Countryman's part that the record does not support.

12. Given that the Coys concluded from their observations of the poor service and the repeated warnings that the Callwoods were being discriminated against, it may reasonably be inferred, *see Matsushita Elec. Indust. Co.,* 475 U.S. at 587–88, 106 S.Ct. 1348, that the Coys never received any such warnings. *See, e.g.,* Deposition of Mary Coy at 40–41 (remarking that the Callwoods "were being asked to move away from the table that no one had asked to sit at as far as I knew").

woods had told her that they no longer wished to be served by her. Smith candidly acknowledged on deposition that he never inquired of the Callwoods to obtain their side of the story;[13] he never made an attempt to hear out the Callwoods' complaints; and he never made an attempt to diffuse the situation. A reasonable person would conclude that this treatment is both so contrary to the manifest financial interest of Dave & Buster's and so far outside of widely accepted business norms as to raise the inference of discriminatory intent.

Moreover, by immediately crediting Countryman's version of the events and purposefully ignoring the Callwoods' objections that they had not told Countryman to go away, Smith unqualifiedly affirmed "acts of service [by Countryman] during the course of which [he had] reason to believe that there may have been a variety of unknown incidents." Restatement (Second) Agency § 91 cmt. e (1958) (Knowledge of Principal at Time of Affirmation). Smith's unqualified affirmance of Countryman's conduct in the face of the Callwoods' protestations "raises the inference that [as principal, Smith was] willing to take the risk of the completeness and accuracy of such knowledge as he ha[d]." *Id.*

Consequently, Smith, a member of defendant's management, may properly be viewed as having ratified the alleged discriminatory intent harbored by Countryman. *See id.* at §§ 82 (Ratification) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."), and 83(a)(Affirmance) ("Affirmance is ... a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized. . . ."). Viewed in the light most favorable to the Callwoods, that ratification became manifest in Smith's extraordinary decision to eject Chimesa Harrison from the restaurant.

Finally, the conclusion that Smith's manner towards the Callwoods was markedly hostile is supported by the sheer facial arbitrariness of his handling of the ejectment of the Callwoods. Dave & Buster's has a policy of frequently "eject[ing] guests ... because of fighting, shouting, causing a scene, or threatening or menacing of other guests or staff." Affidavit of David Joy at 3. According to evidence marshaled by the Callwoods, George Coy came as much within the scope of the ejection policy as did Chimesa Harrison, but with dramatically divergent consequences.

On Smith's first approach to the backgammon table earlier in the evening, George Coy had confronted Smith in the Callwoods' defense, "got up out of his seat, approached [Smith], got real close to him, and started shouting at him. [Coy] shouted a number of profanities as he said to [Smith], 'Why are you harassing this lady, she's just celebrating her son's graduation from the Naval Academy,' and he emphasized that. He said, 'No one has been to this table, there doesn't seem to be a problem, there are plenty of seats around here, I don't understand what's going on here.'" Deposition of Dr. Hortense Harrison at 116–17; *See* Deposition of George Coy at 30 ("I stood up and went up to him and said something to the effect that you [sic] don't you have anything better to do that to give these people a hard time and harass them. I said something to the effect they are not holding a table."). George

---

**13.** *See* Deposition of Adam Smith at 154–55 (Q: Did you ever ask any questions of the Callwood party that evening regarding their side of the events regarding what Debbie Countryman had allegedly said they said? A: What she allegedly said was that they did not wish to have her. Did I ask the Callwoods if that, indeed, was true? *No, I did not ask them that because it became unnecessary because in her statement saying they did not want her to wait on them, she also chose not to wait on them ... I didn't ask them why don't you want this server, because at that point it was presented as a mutual thing ... So it wasn't necessary to ask them and find out that version.)(emphasis added).*

Coy "continued to shout at the manager.... The same things. Just repeated his statements." Deposition of Dr. Hortense Harrison at 117–18. When asked what profanities George Coy used, Dr. Harrison explained that he said "What's the F"ing problem? Hell, look at all these empty seats. Dammit, why are you harassing her?" *Id.* at 118. Coy used the complete profanity. *See id.*

By comparison, when Smith approached the table the second time and explained to the Callwoods that they would no longer be served because he could not find a server for them, and further explained that the Callwoods would not be in this position if they had not told Countryman to stop serving them, Chimesa Harrison reacted by stating "[t]hat's it, I'm outta here." Deposition of Hortense Harrison at 159; Deposition of Chimesa Harrison at 73. Simultaneously with, or immediately after, making the statement, Chimesa Harrison caused some of the leftover bones on her plate to scatter on the table. Without a warning or a request that she sit down, Smith immediately declared, "Ok, that's it. I'm going to have to ask you to leave. You're throwing food at me. You have to leave."

It is clear from this evidence that Smith's response to George Coy (by saying "[s]ir, this does not involve you, sir, this has nothing to do with you. This is not anything concerning you," and asking George Coy to sit down); *see* Deposition of George Coy at 30 ("And I was quickly told it was none of my business and I should sit back down ....."), when contrasted with his summary ejection of Chimesa Harrison—and the entire Callwood party when they protested—would strike the reasonable person as being so facially arbitrary as to support a rational inference of intentional discrimination.

Moreover, when the evidence is viewed in the light most favorable to the Callwoods, Smith's immediate (even precipitous) conclusion—to the exclusion of all other possibilities and in the absence of all inquiry—upon viewing Chimesa Harrison's actions, that an adult woman had intentionally thrown chicken bones at the manager of a restaurant to express her displeasure with his message—would, I conclude, strike a reasonable person as being so cloaked in arbitrariness as to rationally support an inference of discriminatory intent.

On the basis of the foregoing analysis, I am satisfied that the Callwoods have produced sufficient evidence to make out a prima facie case of intentional discrimination under section 1981, in that as members of the protected class who made themselves available to receive and pay for services ordinarily provided by Dave & Buster's to all members of the public, they have demonstrated prima facie that they were deprived of services ordinarily provided by Dave & Buster's while patrons outside the protected class were not deprived those services. In addition, the Callwoods have successfully made out a prima facie case by demonstrating that they were subjected to treatment that was markedly hostile and that they were, under the circumstances, subjected to treatment that a reasonable person would find objectively unreasonable.

2. Dave & Buster's' challenges to the plaintiffs' prima facie case and articulation of legitimate non-discriminatory reasons do not fatally undermine the Callwoods' showing

Dave & Buster's challenges (under its proposed prima facie rubric, adapted for purposes here) the Callwoods' prima facie case by asserting first that the Callwoods have not identified conduct by Smith or Countryman towards similarly situated patrons which creates an inference of discriminatory intent. I have already considered, and rejected, this contention as it relates to the Callwoods' contention that the Coy group is an appropriate comparator for purposes of a "similarly situated"

analysis.[14]

Dave & Buster's next assails the Callwoods' prima facie case by arguing that the Callwoods' allegations do not implicate any rights protected by section 1981. After examining the authorities presented by Dave & Buster's in support of this argument, I must reject it as being inordinately categorical and formulaic. As I have already noted, many people have unpleasant experiences in restaurants and places of public accommodation. And I have expressed my agreement with the principle that the minutiae of an unpleasant dining experience may not be made fodder for federal civil rights claims. However, where, as here, plaintiffs have presented sufficient factual circumstances which rationally support an inference of intentional discrimination, the claims address themselves to "the enjoyment of all benefits, privileges, terms and conditions" of the contractual relationship protected by section 1981(b).

Dave & Buster's is partially correct in arguing that the Callwoods were not denied all service *per se*, but initially only received "poor service."[15] When, however, the allegations "go beyond poor ser-vice," *Bobbitt*, 19 F.Supp.2d at 520, and the inference of discriminatory intent has been successfully raised, as is the case here, what would initially be seen as "a regrettable and frustrating ... phenomenon familiar to all who eat at restaurants," *id.* at 519–20, becomes conduct which necessarily implicates section 1981's protection of the "enjoyment of all benefits, privileges, terms and conditions" of the contractual relationship.[16]

The seating policy allegations set forth by the Callwoods mirror a claim sustained by the Fourth Circuit in *Wyatt*, 819 F.2d at 69, where the plaintiffs "alleged that the lounge's 'drinks only' policy was discriminatorily applied to ... black patrons." *Id.* at 70; *see also Hill v. Kookies, Inc.*, 1999 WL 608713 (N.D.Ill., August 4, 1999)(denying plaintiff's motion for summary judgment on section 1981 claim that bar had policy of discriminatorily charging higher cover charge to African–American patrons). And, like the plaintiffs in *McCaleb*, 28 F.Supp.2d at 1048, the Callwoods were subjected to a disturbing atmosphere (though less permeated by overt manifestations of racial animus than in *McCaleb*),

---

**14.** Even if I were to accept this argument, I would find that the conduct of Chimesa Harrison and George Coy was of "comparable seriousness," thereby warranting a conclusion that they were similarly situated. *See Settle v. Baltimore County*, 34 F.Supp.2d 969, 992 (D.Md.1999)(quoting *Moore*, 754 F.2d at 1107), *aff'd*, 203 F.3d 822, 2000 WL 51283 (4th Cir.2000)(table); *Cook*, 988 F.2d at 511; *Dartmouth Review*, 889 F.2d at 19.

**15.** Of course, the undisputed fact is that the Callwoods were not merely *denied* service; *they were denied a meal altogether by virtue of their ejectment.*

**16.** When a person or party enters an eating or drinking establishment and requests to be served, a contractual relationship is most certainly established between the patron and the restauranteur. *See, e.g., Bobbitt*, 19 F.Supp.2d at 519 (holding that African–American plaintiffs had stated a claim under section 1981 when they were forced to prepay for food ordered in restaurant); *McCaleb*, 28 F.Supp.2d at 1048 (denying defendant restau-rant's motion for summary judgment on African–American plaintiffs' claim that restaurant refused to sell drinks to plaintiffs when plaintiffs had already purchased pizza); *Laroche*, 62 F.Supp.2d at 1382–83 (entering judgment for African–American plaintiffs who entered restaurant, were seated, requested service, but were falsely told that the restaurant was out of food). The Fourth Circuit has approved this principle. *See Wyatt*, 819 F.2d at 69 (affirming judgment for plaintiffs against hotel lounge).

> As for the particulars of the contractual relationship, one court has noted that: general contract principles apply to the ordering of food in a restaurant. In short, a restaurant which opens itself to the public, offering food at set prices, is making an offer. A customer who enters a restaurant and orders such food is accepting the offer, and thus forming a contract. Upon eating the food and paying consideration for it, the customer effectively terminates the contractual relationship.

*Charity v. Denny's, Inc.*, 1999 WL 544687, *3 (E.D.La., July 26, 1999).

had expressed interest in purchasing food, and were, like the plaintiff in *McCaleb,* denied the "accouterments ordinarily provided with a restaurant meal." *Id.*

Based on *Wyatt, Bobbitt* and *McCaleb* and, more importantly, on Congress' view of section 1981 as "a critically important tool used to strike down strike down racially discriminatory practices in a broad variety of contexts." H. Rep. No. 102–40, pt. II, at 36, *reprinted in* 1991 U.S.C.C.A.N. at 729, I am satisfied that the Callwoods' claim that they received treatment that went "beyond poor service" implicates rights protected by section 1981(b).

In response to a properly supported prima facie case, then, Dave & Buster's argues that Countryman's manner of service and seating policy warnings to the Callwoods are explainable by Countryman's "legitimate[ ] concern[ ] that if other guests were prevented from sitting in any of the unoccupied seats, she would likely lose substantial income." Dave & Buster's also argues that Smith had a legitimate non-discriminatory reason for ejecting Chimesa Harrison, and subsequently the entire Callwood party, because he reasonably believed that Chimesa Harrison had

intentionally thrown chicken bones at him and that the Callwoods' protestations were unreasonably disruptive to the decor of the restaurant.[17]

**3. There exist genuine issues of material fact on the question of pretext**

■ Based on the submissions before me, I am satisfied that the Callwoods have adduced sufficient evidence to create a genuine issue of material fact as to whether Countryman's and Smith's explanations for their treatment of the Callwoods are pretextual and whether, instead, unlawful discrimination was the real reason for their conduct.

Specifically, as to Countryman's explanation, in addition to the evidence of discriminatory intent evaluated above, the Callwoods have submitted evidence, first, in the form of the testimony of bartender Kelly Adcock which, by stating that pursuant to procedure he would have placed the drink orders he took from Dr. Harrison on Countryman's ticket, suggests that Countryman was aware that the Callwoods were in fact ordering drinks.[18] This evidence creates a genuine issue of material fact as to whether the explanation that Countryman was legitimately concerned

**17.** Dave & Buster's relies on *White v. Denny's,* 918 F.Supp. 1418 (D.Colo.1996), and *Alexis v. McDonald's Restaurants of Massachusetts,* 67 F.3d 341 (1st Cir.1995), for the proposition that Smith was entitled to respond to what he assessed to be an unpleasant public incident, and that such actions can never constitute discrimination. To read these cases, as does Dave & Buster's, to invest restauranteurs with unfettered discretion to act with impunity towards their customers would eviscerate section 1981's protection against unlawful discrimination.

A closer look at the cases reveals that in *White* the district court found that the restaurant manager had treated the plaintiffs and members outside the protected class *equally. See* 918 F.Supp. at 1428 ("Upon thorough review and consideration, I find that all the evidence before me reveals that [the restaurant manager and security guard] treated plaintiffs ... equally."). As a result, viewing the evidence as a whole, the district court concluded that there was no basis for a find-

ing of intentional discrimination. *See id.* at 1428–29.

Similarly, in *Alexis,* the court concluded that the plaintiff had pointed to "no competent evidence that [the restaurant employee and manager] discriminated against her on account of race...." 67 F.3d at 347. Thus, the plaintiffs in *White* and *Alexis* did not present evidence sufficient to support the required showing of intentional discrimination. Here, by contrast, and as detailed in text, the Callwoods have presented sufficient circumstantial evidence of intentional discrimination to create a genuine issue of material fact on the question of pretext.

**18.** *See* Deposition of Kelly Adcock at 28 ("Q: And do you know who [Dr. Harrison] paid? A: If I am correct, the procedure would have been that Deb [Countryman] would have presented the check to her."); *id.* at 31 ("If I take and order for a cocktail [waitress], I would give that to her ... I see [that] the cocktail [waitress] and that guest actually come together.").

about losing tips because she believed the Callwoods were not spending money was pretext for unlawful discrimination, i.e., whether Countryman is credible.

Second, the Callwoods have submitted evidence which strongly suggests that they were well within compliance of the seating policy *as Countryman understood it.* When this evidence is combined with evidence that Countryman initially turned the large (then nine-member) Callwood party away upon their entry into the bar area; that she deprived the Callwoods of a level of service that she clearly seems to have provided to the adjacent Coys; and that she repeatedly warned the Callwoods about saving seats, there exists a genuine issue of material fact as to whether Countryman was indeed motivated by financial considerations.

Finally, the Callwoods have submitted evidence which suggests that Countryman may have falsely attributed bad faith and/or misconduct to the Callwoods in two ways.

First, Countryman told Smith that she observed a party of patrons approach the backgammon table but were turned away by Dr. Harrison. The Callwoods and, perhaps, the Coys undermine this account. But, even assuming the veracity of this statement, Countryman's contention that she was concerned that another group arrived and was turned away raises a substantial question about the enthusiasm Countryman appears to have exhibited for the mystery party, when that enthusiasm is contrasted with her seeming indifference towards the Callwoods.

Second, Countryman also told Smith that the Callwoods had unequivocally told her that they did not want her to be their server. This statement is flatly inconsistent with Dr. Mark Harrison's subsequent statement to Countryman herself that the Callwood party would like to order *from her.*

As to Smith's explanation, the Callwoods have identified, first, contradictions in Smith's deposition which a reasonable juror could reasonably conclude undermine his version of the events. For example, in Smith's initial account of the "food throwing" incident, he recited that Chimesa Harrison spoke an expletive after, rather than contemporaneously with, the scattering of the bones. *See* Deposition of Adam Smith at 80–87 (discussing his perception of Chimesa Harrison's actions). If the factfinder concludes that he is not worthy of belief, then the entire matrix of this case is altered.

Ultimately, while Dave & Buster's' proffered explanations are sufficient to satisfy the defendant's burden of production, under the circumstances here, their very legitimacy hinges upon the factfinder's assessment of their truthfulness. *See Jiminez,* 57 F.3d 369 at 378 ("[U]nder *St. Mary's,* the fact-finder's rejection of the legitimate, nondiscriminatory reason proffered by the defendant, coupled with the elements of the prima facie case, may permit the fact-finder to infer the ultimate fact of invidious discrimination with no additional proof of discrimination...."); *Vaughan v. MetraHealth Companies, Inc.,* 145 F.3d 197, 201 (4th Cir.1998)("Depending on the character of the evidence in each case, a discrimination claim may survive summary judgment solely on the strength of the prima facie case and the evidence that contradicts the employer's proffered justification—if that evidence provides a factual basis for the ultimate finding of discrimination.")(age discrimination case).

On the basis of the foregoing, I am persuaded that there is sufficient evidence from which a reasonable jury could conclude that Dave & Buster's' proffered reasons for Countryman's treatment of the Callwoods and Smith's ejection of Chimesa Harrison and subsequently the entire Callwood party were pretexts for discrimination and accordingly I will deny the motion for summary judgment. *Compare Theard v. Glaxo, Inc.,* 47 F.3d 676, 680 (4th Cir.1995)(affirming grant of summary

judgment against plaintiff because plaintiff had not produced sufficient direct evidence to demonstrate that reasons were pretext and had not produced sufficient circum-stantial evidence of discrimination to create a triable issue); *Evans*, 951 F.Supp. at 89 (granting summary judgment in favor of defendants because plaintiffs had failed to produce sufficient evidence upon which a reasonable juror could conclude that plaintiffs had established a prima facie case).

## B. The Gilbert Case

■ The Gilberts' showing plainly fails the above test for a prima facie case and does not establish a rational basis for an inference of intentional discrimination.[19] For the reasons set forth below I will grant Dave & Buster's' motion for summary judgment.

So far as I can tell, the thrust of the Gilberts' strategy has been to identify as many incidents of perceived mistreatment as possible (nine, according to my count), inject race into the mix and then characterize Dave & Buster's to be, in effect, a racially hostile environment from which they were "constructively evicted." The evidence does not bear out this "panoramic" theory. To the contrary, the record demonstrates that the Gilberts were not deprived of services provided by Dave & Buster's while similarly situated patrons outside the protected class were not deprived of those services. And, where the Gilberts have alleged, in effect, that they were treated in a manner that was markedly hostile and objectively unreasonable, the evidence establishes that where serious misunderstandings occurred between Dave & Buster's staffers and the Gilberts, Dave & Buster's' employees offered or attempted to offer accommodating treatment to the Gilberts.

I first address the incidents alleged by the Gilbert for which there is utterly no basis on this record to justify a finding that the Gilberts were deprived of services while similarly situated persons outside the protected class were not deprived of those services. These are the Gilberts' allegations that they were discriminated against in the designation of their seating arrangements; in the denial of their request for complimentary computer cards; in the manager's changing of the television channel away from the basketball game; and in the attendant's alleged comment in the arcade.

The Gilberts' theory animating the allegation that they were discriminated against in the designation of their seating arrangements runs as follows: since African–Americans have historically been seated in the rear area of restaurants, near the kitchen, and since the Gilberts, who are African–American, were likewise seated at two round tables near the kitchen and denied seating at a large table in the balcony which a white party later occupied, the Gilberts were "segregated away" from white patrons and hence discriminated against. The Gilberts also seem to argue that the fact that they were not assisted in pushing together their tables is further probative of discriminatory intent.

Dave & Buster's explains that pursuant to routine procedure, large groups wishing for tables to accommodate groups of their size make a request to wait for a table to be prepared. After personnel create the table, the large party is paged by Dave & Buster's internal pagers, informing the party that its table is ready. Since the large party of white patrons invoked this procedure and the Gilberts did not, Dave & Buster's explains, the balcony table was

---

**19.** Because I resolve the Gilberts' claims on evidentiary considerations established by *McDonnell Douglas, Burdine* and *Hicks*, I need not determine whether any of the allegations made by the Gilberts come within the protection section 1981 affords against discrimination in the "privileges, benefits, terms and conditions" of the contractual relationship at issue. *See* 42 U.S.C. § 1981(b).

in fact unavailable as to the Gilberts. The Gilberts have offered no evidence which undermines this explanation.[20]

Apart from inquiring about the balcony table, the Gilberts never expressed dissatisfaction with their seating arrangements, never asked for another table, and more importantly, never requested to wait for another, more satisfactory, table to be prepared for their party.[21] Therefore, the Gilberts have failed to establish that they were deprived of services while similarly situated members outside the protected class were not deprived of those services.[22] In addition, the same failure to show that they requested to wait for a table to be prepared demonstrates that the Gilberts

cannot in any sense be understood to have been even approximately, much less precisely, see *Myers,* 50 F.3d at 284; *Cook,* 988 F.2d at 511; *Moore,* 754 F.2d at 1107–11, similarly situated with the party of white patrons who occupied the balcony table.

In addition, the Gilberts have presented no evidence that only African–Americans were seated in the dining area by the kitchen to the exclusion of other patrons. In the absence of such evidence, the Gilberts' syllogistic allegations of "segregation" and discrimination will not satisfy their burden of establishing the prima facie element of intentional discrimination required by section 1981.

**20.** The only contrary evidence offered by the Gilberts on this issue consists of the observations of the Gilberts themselves, made upon entering the restaurant and during the approach to their tables. By asserting that they did not notice any other patrons waiting for seating and that they did not they hear any parties being announced on the loudspeakers, the Gilberts expansively infer that the party of white patrons (or any other party for that matter) could not possibly have arrived at the restaurant prior the Gilberts; could not possibly have requested that a table be prepared to accommodate their group; could not possibly have been overlooked by the Gilberts or have been in another part of the establishment— the arcade or bar area, for example—when the Gilberts arrived at the establishment; and could not possibly have been contacted by Dave & Buster's' management without the Gilberts' knowledge.

This collection of inferences, which forms the sole evidentiary basis for the Gilberts' assertion that Dave & Buster's' explanation for the seating arrangement is pretext for unlawful discrimination, is, I conclude, patently unreasonable. I decline the invitation to draw these inferences in the Gilberts' favor. *See Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348.

**21.** *See* Deposition of Mekisha Nash at 47–48 ("Q: Did anyone from your group ask how long the wait would be for tables? ... Any table, any seating? A: No. Not that I recall."); Deposition of Lisa Gilbert at 231 ("Q: Did you hear Mekisha Nash speak to the hostess? A: When we arrived at the tables, yes ... Ms. Nash pointed and asked could we sit somewhere else in the dining facility. The hostess explained to her this was it. Q: Did

the hostess say anything else to her at that point? A: I can't recall. Q: Did Ms. Nash say anything else to the hostess? A: I can't recall.")

Regarding the allegation that being seated near the kitchen constitutes discrimination, *see* Deposition of Lisa Gilbert at 227 ("We were seated by the kitchen, which to me definitely shows discrimination towards blacks. Because, as I recall, blacks have always been seated near the kitchen."); Deposition of Tiajuana James at 414 ("Q: And what evidence do you have to support [the claim that sitting by the kitchen was discriminatory]? Q: I can recall studying from history that blacks have sat in the back by the kitchen and that's the way I felt. A: Do you have any other evidence or facts to support your claim? No, the fact that I sat by the kitchen.").

**22.** The Gilberts commit the very same critical error the plaintiffs made in *Jackson v. Tyler's Dad's,* 850 F.Supp. 53 (D.D.C.1994). There, as here, the plaintiffs assumed that an unoccupied table was available. *See* 850 F.Supp. at 55. And, like the plaintiffs in *Jackson,* the Gilberts have produced no evidence, beyond surmise, that the table they inquired about was available at the time they were seated. *Compare id.* Since Dave & Buster's' explanation of why the table was unavailable—i.e., pursuant to routine procedure, members of a party that requests a table to accommodate their number are paged by one of Dave & Buster's' internal pagers when the larger table has been created and set—is entirely consistent with its "no reservation policy," it is *not* reasonable to infer that the table, being unoccupied, was available as the Gilberts contend.

The Gilberts have also failed to produce evidence of similarly situated patrons outside the protected class who were given complimentary computer cards on demand; who were permitted to watch television in any place in the restaurant without restriction; or who were afforded solicitous treatment by their attendant. *See Myers*, 50 F.3d at 284. *Dartmouth Review*, 889 F.2d at 19; *Cook*, 988 F.2d at 511; *Moore*, 754 F.2d at 1107–11. There is, therefore, no rational basis for inferring discriminatory intent.

I next address the instances alleged by the Gilberts in which they allege, in effect, that they were treated in a manner that was markedly hostile. The first is the allegation of discrimination in Dave & Buster's' handling of the incident at the coin drop machine.

Upon responding to the radio call summoning him to the coin drop machine, Welsh immediately pointed a finger in Lisa Gilbert's face, warning her twice that if he had any more trouble out of "you people" he would have the Gilberts put out of the establishment. When Tiajuana James protested that he was not addressing himself to the father and son who were part of the incident, Welsh responded that he was addressing everyone involved. During the exchange the members of the Gilbert party heard one of the attendant security personnel say "those Black Motherf* * *ers." Welsh neither endorsed nor acknowledged the remark when it was made and it was not specifically brought to his attention by the Gilberts.

At the end of the confrontation, Welsh instructed the parties to refrain from having contact with each other or both parties would be ejected from the premises. Rodriguez approached members of the Gilbert party and apologized for the conduct of his colleagues. For his part, Welsh personally approached Tiajuana James and apologized. He also provided Tiajuana James with complimentary computer cards.

Even accepting the Gilberts' theory that Welsh's initial suspicion fell disproportion-

ately upon members of their party, the Gilberts have failed to establish that his conduct towards them was at any time markedly hostile. In particular, Welsh's and Rodriguez's apologies after the incidents demonstrate that their overall conduct was not so contrary to the manifest financial interest of Dave & Buster's, nor so far outside widely accepted business norms as to rationally support an inference of intentional discrimination. Moreover, given that Welsh ultimately amended his warnings to encompass the party of white patrons with whom the Gilberts were disputing—and made good on his threat to eject them later in the evening—Welsh's conduct cannot be characterized as being so facially arbitrary as to create an inference of intentional discrimination.

With the benefit of hindsight, Welsh certainly could have handled the matter in a manner more calculated to preserve the Gilberts' dignity. However, as the Gilberts themselves concede, the evidence strongly indicates that whatever shortcomings manifest in Welsh's managerial demeanor (and in the demeanor of his subordinates) in the heat of the moment, he was forthright enough to acknowledge the professional lapse when the tension of the moment dissipated. He apologized and attempted to demonstrate his sincerity with the offer of complimentary computer cards. Rodriguez, recognizing the lapse of his colleagues, also apologized. Such conduct under the circumstances of this case cannot rationally support an inference of intentional discrimination.

The remaining incidents relied upon by the Gilberts include Andre Andrews' brief wait at the entrance of the facility; the removal of George Gilbert from the stool in the arcade; and the events surrounding the Gilberts' departure.

After a thorough of review of the record, I am satisfied that as a matter of law there is insufficient evidence to establish the requisite prima facie showing that these instances of conduct were either so con-

trary to the manifest financial interest of Dave & Buster's, so far outside of widely accepted business norms, or so facially arbitrary as to rationally support an inference of discriminatory intent.

To place the whole of the Gilberts' allegations and claims in proper context, I cite in conclusion the following seven examples of how employees of Dave & Buster's offered the Gilberts accommodating treatment: (1) at the entrance to the establishment when Tiajuana James complained that Andre Andrews was held at the door for not having proper identification after she observed other nonAfrican Americans enter with proper identification, Andrews was allowed to enter; (2) when Mekisha Nash and Lisa Gilbert complained that their fish was dry, their waiter, Michael Wendling, returned their orders to the kitchen to have the problem corrected; (3) when Lisa Gilbert, Tiajuana James and Chanda Hutcherson were denied their request for complimentary computer cards by Welsh, their waiter, Wendling, immediately apologized for the misunderstanding; (4) when Tiajuana James complained to one of the technicians that her machine was malfunctioning, he opened the machine and returned game tokens to her and her sister; (5) after Welsh had intervened in a dispute between members of the Gilbert party and a party of white patrons and warned both parties that they could both be ejected from the establishment, Welsh himself apologized and provided members of the Gilbert party with complimentary computer cards; (6) after the same incident, the technician, Rodriguez, apologized to members of the Gilbert party for actions of some of his colleagues; and (7) while the Gilberts were leaving the establishment, Welsh walked with Michelle Walters to the door and inquired whether the members of the Gilbert party had enjoyed themselves, despite some misunderstandings.

While I do not mean to endorse a tenet of law which would permit a simple apology to absolve the intentional discriminator of responsibility for acts of unlawful discrimination, on this record, I am convinced that in addition to the fairly weak evidence of discrimination offered by the Gilberts, the acts of apology and accommodation on the parts of Messrs. Wendling, Welsh and Rodriguez to members of the Gilbert party following the incidents cited by the Gilberts, would dispel any residual suspicion in the minds of reasonable persons that intentional racial discrimination, rather than misjudgment or poor judgment animated the actions of those employees. The suggestion that the overall treatment of the members of the Gilbert party amounted to a "constructive eviction" is nothing more than a conclusory assertion lacking any evidentiary support.

## VI. CONCLUSION

For the reasons set forth above, as to the Callwoods' section 1981 and Title II claims, I will deny Dave & Buster's' motion for summary judgment. As to the Gilberts' section 1981 and Title II claims, I will grant Dave & Buster's' motion.